UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                    CASE NO. 8:20-cr-309-SDM-AEP

GLIB OLEKSANDR IVANOV-TOLPINTSEV

## UNITED STATES' SENTENCING MEMORANDUM

The United States of America, by and through the undersigned Assistant United States Attorney, hereby submits its sentencing memorandum. As explained below, and pursuant to 18 U.S.C. § 3553(a), the United States respectfully submits that a sentence of 60 months' imprisonment is appropriate in this case.

## I.    Procedural History

On May 13, 2020, a U.S. Magistrate Judge in the Middle District of Florida, Tampa Division, signed a criminal complaint charging the defendant, Glib Oleksandr Ivanov-Tolpintsev, with conspiring to traffic in unauthorized access devices and computer passwords, in violation of 18 U.S.C. §§ 371, 1029(a)(2), and 1030(a)(6). Doc. 1. A warrant was issued for his arrest. Doc. 3. Polish authorities in Korczowa, Poland, took Ivanov-Tolpintsev into custody on or about October 3, 2020, and he was extradited to the United States pursuant to the extradition treaty between the United States and the Republic of Poland.

On October 6, 2020, a federal grand jury returned a four-count indictment in the Middle District of Florida, Tampa Division, charging Ivanov-Tolpintsev with one count of conspiring to traffic in unauthorized access devices and computer

passwords, in violation of 18 U.S.C. §§ 371, 1029(a)(2), and 1030(a)(6), and three substantive counts of trafficking in unauthorized access devices and computer passwords, in violation of 18 U.S.C. §§ 1029(a)(2) and 1030(a)(6). Doc. 4. On February 22, 2022, Ivanov-Tolpintsev pleaded guilty to the conspiracy count pursuant to a written plea agreement. Docs. 36-37. Sentencing is scheduled to take place on May 12, 2022. Doc. 41.

## II.    Presentence Investigation Report

On May 5, 2022, the U.S. Probation Office issued its final Presentence Investigation Report ("PSR"). Doc. 48. It determined Ivanov-Tolpintsev's applicable guideline range for the underlying offense as 57-60 months' imprisonment, based on an adjusted total-offense level of 25, a criminal history category of I, and a statutory maximum term of imprisonment of five years. *Id.* at ¶ 68.

### A.    Objection

The parties have no remaining factual objections to the PSR, and the United States has no remaining legal objections to the PSR. Ivanov-Tolpintsev maintains a legal objection to paragraph 32 of the PSR, which, relying on USSG § 2B1.1(b)(1)(I), increases his offense level by 16 levels. Specifically, Ivanov-Tolpintsev objects to the use of the $500 per access device directive in USSG §2B1.1, comment note 3(F)(i), to determine loss in the §2B1.1(b)(1) guideline. For the reasons that follow, this Court should overrule Ivanov-Tolpintsev's objection and adopt the remainder of PSR's facts and guidelines calculation.

Section § 2B1.1(b) requires the Court to determine "loss." And in this case, the Guidelines require the use of a formula that the Sentencing Commission has established for access device-related offenses; USSG. § 2B1.1, Application Note 3(F)(i). Ivanov-Tolpintsev argues that the Court should disregard the Sentencing Commission's directive to use this formula, citing *United States v. Riccardi*, 989 F.3d 476 (6th Cir. 2021). The defendant in *Riccardi* stole 1,322 gift cards with "total face values of $47,000." *Id*. at 486. The Sixth Circuit did not address the defendant's intended loss (or gain) when she stole the cards, but rather focused on the lack of "evidence suggesting that the total 'damage' from this theft approached the $752,500." *Id*. The Sixth Circuit concluded that the access device formula constituted a substantive rule which had not been properly adopted as such. *Id*. at 483. In order to reach that result, the *Riccardi* court disregarded decades of precedent that made clear that loss estimates and formulae, such as that adopted in Application Note 3(F)(i) of § 2B1.1, are appropriate tools for estimating loss.

Because of the unique difficulty in determining loss in the context of access device theft and fraud cases, an efficient way to ensure uniformity in the application of § 2B1.1 is to adopt a framework for making the required loss estimate; which is precisely what the Sentencing Commission has done. The actual or intended loss is unusually difficult to identify in access device cases for a number of reasons: the offenses frequently involve the theft of large volumes of access devices; the offenses typically do not involve an explicit demand for a particular amount of money; and the offenses typically involve an intent to steal as much money as possible, without

knowing the available amount.

The Sentencing Guidelines have recognized these challenges since the beginning. The original guidelines directed courts to apply a minimum $100 loss for stolen credit cards. *See* USSG 2B1.1 (1987), Application Note 4 ("The loss includes any unauthorized charges made with stolen credit cards, but in no event less than $100 per card."). For most cases, the amount was increased from $100 to $500 after the Sentencing Commission conducted further research—which was required by Section 4 of the Identity Theft and Assumption Deterrence Act of 1998, Pub. L. 105–318(b)(1)—that directed it to ensure that the Sentencing Guidelines provided appropriate penalties for identity theft crimes (e.g., identity theft crimes involving credit cards). The Sentencing Commission's research at that time indicated that, with the exception of certain telecommunications access devices, the $100 loss estimate was insufficient. *See* USSG, Appendix C, Amendment 596 (2000).

After more than a decade of published decisions in thousands of cases by federal courts at every level, it is settled that the term "loss," as used in the Sentencing Guidelines, includes actual loss, intended loss, and estimated loss. *See e.g.*, *United States v. Maitre*, 898 F.3d 1151 (11th Cir. 2018); *United States v. Nelson*, 724 Fed. Appx. 814, 819 (11th Cir. 2018) (Unpublished); *United States v. Wright*, 862 F.3d at 1275 (11th Cir. 2017); *United States v. Torres-Bonilla*, 556 Fed. Appx. 875, 882 (11th Cir. 2014) (Unpublished); *United States v. Acevedo*, 860 Fed. Appx. 604, 612 (11th Cir. 2021) (Unpublished). When the Sentencing Commission adopted its commentary in 2001, including Application Note 3(F)(i), it was not only permitted, but was in fact

4

required, to interpret the term "loss." And as the law stands, that term in the sentencing context plainly embraces intended, actual, and estimated loss. Accordingly, Application Note 3(F)(i) is a permissible, appropriate, and reasonable interpretation of § 2B.1.

## III. Argument in Support of a Guideline Sentence

This Court must consider all of the sentencing considerations set forth in Section 3553(a). *Gall v. United States*, 552 U.S. 38, 49-50. Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

In this case, a guidelines sentence is both necessary and reasonable because it reflects the seriousness of Ivanov-Tolpintsev's crimes, provides just punishment for those crimes, protects members of our community, affords adequate deterrence, and promotes respect for the law.

## A.    History and Characteristics of the Defendant

The PSR does not reveal anything remarkable about Ivanov-Tolpintsev's childhood or life that could explain his offense conduct. He was raised by two caring and attentive parents—with whom he shares an ongoing, positive relationship—and states that he was "always well provided for." Doc. 48, ¶¶ 53-54. Ivanov-Tolpintsev does not suffer from mental or emotional disabilities, and has no history of substance abuse. *Id.* at ¶¶ 59-61. Additionally, at no time did Ivanov-Tolpintsev appear to be in financial distress, which may have explained his offense conduct.

By all measures, Ivanov-Tolpintsev is intelligent, well-educated, and successful. In 2016, he received a bachelor's degree from Lviv National Agricultural University in Lviv, Ukraine. *Id.* at ¶ 62. He speaks Ukrainian, Russian, Polish, and is learning English. *Id.* Ivanov-Tolpintsev previously worked for his father's filters and engine oil company, and has been financially supported by his parents during periods of unemployment. *Id.* at ¶¶ 54, 64-65. In short, Ivanov-Tolpintsev's history and characteristics weigh in favor of guidelines sentence, and does not support a downward departure or variance.

## B.    Nature and Circumstances of Offense

The Marketplace was a dark web website that illegally sold login credentials (usernames and passwords) to servers located across the world and personally identifiable information (dates of birth and social security numbers) of U.S. residents. Doc. 48, ¶ 18. Once purchased, criminals used these servers to facilitate a wide range of illegal activity that included tax fraud and ransomware attacks. *Id.* at ¶ 19.

In total, the Marketplace offered over 700,000 compromised servers for sale; including at least 150,000 in the United States and at least 8,000 in Florida. *Id*. The Marketplace listed each server by partial IP address. Buyers could filter servers by country, state, city, operating system, or internet service provider. As depicted below, in addition to price, the Marketplace provided information that could be used to determine to what extent a buyer would be able to access and/or exploit the server. For example, "Admin Privilege" indicated whether the credentials provided administrator access, and "Direct IP" indicated whether the server sat behind a firewall.



Some of the information provided by the Marketplace could also be used to determine what type of fraud a buyer could commit after accessing the server. For example, as depicted above, the presence of annual editions of tax preparation software (e.g., UltraTax) indicated that a server may be valuable in committing tax fraud, whereas several commercial websites visited (e.g., BestBuy, Amazon, eBay, Target, and Office Depot) could indicate the presence of stored credit card information and present the potential of credit card fraud.

Marketplace victims spanned the globe and industries, including local, state, and federal government infrastructure, hospitals, 911 and emergency services, call centers, major metropolitan transit authorities, accounting and law firms, pension funds, and universities. *Id.* at ¶ 20. In January 2019, the U.S. Attorney's Office for the Middle District of Florida, Tampa Division, seized the Marketplace's domain names and dismantled the website's infrastructure, effectively ceasing its operation.

Two Ukrainian nationals/residents, referred to herein as Conspirator #1 and Conspirator #2, administered the Marketplace. *Id.* The administrators practiced exceptional operational security; operating the website across a widely distributed international network, and utilizing cryptocurrency in order to hide the locations of the Marketplace's underlying servers and the identities of its administrators, sellers, and buyers. *Id.*

For nearly a year, Ivanov-Tolpintsev communicated with the administrators in an attempt to become a seller. For example, in chats dated May 23, 2016, and depicted below, Ivanov-Tolpintsev asked about the requirements to become a seller on the Marketplace. Conspirator #1 explained that sellers must have a database of credentials from at least 5,000 compromised servers, and the ability to upload 500 credentials to the Marketplace each week. Ivanov responded that he planned to be able to satisfy those requirements

| Timestamp | Speaker | Message |
|---|---|---|
| 2016-05-23 13:42:33 | Ivanov-Tolpintsev | What is needed to open the sellers account |
| 2016-05-23 14:04:24 | Conspirator #1 | We only work with serious suppliers. |

| | | i.e. they need to have a database of 5k servers, the database can not have guest logging such as guest, invite or something similar. Next, every week, upload to the shop at least 500 servers. If conditions are not met, the system automatically bans the seller. |
| 2016-05-23 14:07:32 | Ivanov-Tolpintsev | Understood. The requirements are attainable, just need to buy several more servers for brute purposes. |
| 2016-05-23 14:07:52 | Ivanov-Tolpintsev | I will write you latter. Thank you. |

Just as with Ivanov-Tolpintsev's chats with Conspirator #1, the chats with Conspirator #2 chronicled Ivanov's attempts to become a seller on the Marketplace. For example, in the chats dated March 28, 2017, and depicted below, Ivanov-Tolpintsev confirmed that for months he had been collecting server credentials via brute force attacks

| Timestamp | Speaker | Message |
|---|---|---|
| 2017-03-28 13:36:31 | Ivanov-Tolpintsev | Hi |
| 2017-03-28 13:36:55 | Ivanov-Tolpintsev | How are you? |
| 2017-03-28 14:33:15 | Conspirator #2 | Hi |
| 2017-03-28 14:33:18 | Conspirator #2 | Same old, same old |
| 2017-03-28 14:33:26 | Conspirator #2 | Have you figured out the brute[forced attacks]? |
| 2017-03-28 14:33:34 | Ivanov-Tolpintsev | Uh-huh |
| 2017-03-28 14:34:27 | Ivanov-Tolpintsev | I increased the output to 3k |
| 2017-03-28 14:34:27 | Conspirator #2 | You've been collecting 2-3k of deds for three months now |
| 2017-03-28 14:34:55 | Ivanov-Tolpintsev | I'm sitting and setting it up |
| 2017-03-28 14:37:07 | Ivanov-Tolpintsev | I'll finish checking,[1] then look at the valid outcome |

---

[1] "Checking," in this context, refers to running automated software that determines if the username and password returned by a brute-forcing tool still provides access to a compromised server. This software is important because, in many instances, victims change their password after realizing that their server has been compromised.

Conspirator #1 and Conspirator #2 eventually accepted Ivanov-Tolpintsev as a seller with the Marketplace, and on January 8, 2017, Ivanov-Tolpintsev created an account under the username "Mars." Doc. 48, ¶ 21. From January 8, 2017, until January 15, 2019, Ivanov-Tolpintsev listed the login credentials for approximately 6,704 servers on the Marketplace, including more than 100 in the Middle District of Florida. *Id.* at ¶ 22. Marketplace buyers paid at least $82,648 for servers listed by Ivanov-Tolpintsev.

## C. Promote respect for the law

This Court's sentence must reflect the need to "promote respect for the law." 18 U.S.C. § 3353(a)(2)(A). Individuals involved in sophisticated, international cybercrime schemes, such as Ivanov-Tolpintsev, often believe that they operate anonymously in the digital space. This belief is bolstered when the cybercriminals reside in a country that neither officially shares evidence with the United States nor extradites its criminals to the United States; like Ukraine. This is evident in Ivanov-Tolpintsev's cavalier, prolonged victimization of thousands of victims solely for his own financial benefit.

Additionally, investigating and prosecuting cases of this type requires the investment of significant resources and extensive collaboration both domestically and abroad. For example, the investigation of the Marketplace yielded in excess of 100 terabytes of evidence derived from thousands of subpoenas, and dozens of search warrants and Mutual Legal Assistance Treaty Requests. Ivanov-Tolpintsev's actions displayed a gross indifference toward the laws of the United States and the

individuals and companies he victimized. This Court's sentence must express an appropriate level of condemnation of his crimes, and a guidelines sentence would do just that.

### D.    Afford Adequate Deterrence to Criminal Conduct

This Court's sentence must also afford adequate deterrence to criminal conduct. 18 U.S.C. § 3553(a)(2)(B). Section 3553(a)'s legislative history demonstrates that Congress viewed deterrence as "particularly important in the area of white-collar crime." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting S.Rep. No. 98–225, at 76 (1983)); *United States v. Livesay*, 525 F.3d 1081, 1094 (11th Cir. 2008). Defendants in white-collar crimes often calculate the financial gain and risk of loss, and white-collar crime, therefore, can be affected and reduced with serious punishment. *Martin*, 455 F.3d at 1240. Because economic and fraud-based crimes are "more rational, cool, and calculated than sudden crimes of passion or opportunity," these crimes are "prime candidate[s] for general deterrence." *Id*.

Ivanov-Tolpintsev's involvement with the Marketplace was prolonged (lasting more than two years), widespread (affecting thousands of victims located all over the world), and appears to have been motivated by greed and a risk/reward calculus— precisely the type of crime amenable to general deterrence. *See id*. But beyond merely deterring Ivanov-Tolpintsev from engaging in future fraud, this Court should also impose a guidelines sentence to send a strong warning to other cybercriminals operating outside of the United States and currently involved in or considering similar conduct. Such a sentence would serve to deter this type of criminal conduct

and protect the community.

## IV.    Conclusion

This Court should sentence Ivanov-Tolpintsev to 60-month term of

imprisonment. A guidelines sentence is reasonable because it reflects the seriousness

of Ivanov-Tolpintsev's crimes, provides just punishment for those crimes, protects

members of our community, and promotes respect for the law.

> Respectfully submitted,
>
> ROGER B. HANDBERG
> United States Attorney

By:    */s/ Carlton C. Gammons*
Carlton C. Gammons
Assistant United States Attorney
Florida Bar Number 85903
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
Telephone:   (813) 274-6000
Facsimile:    (813) 274-6358
E-mail: Carlton.Gammons@usdoj.gov

**U.S. v. Glib Oleksandr Ivanov-Tolpintsev    Case No. 8:20-cr-309-SDM-AEP**

## CERTIFICATE OF SERVICE

I hereby certify that on May 11, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to counsel of record.

*/s/ Carlton C. Gammons*
Carlton C. Gammons
Assistant United States Attorney
Florida Bar Number 85903
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
Telephone:   (813) 274-6000
Facsimile:    (813) 274-6358
E-mail: Carlton.Gammons@usdoj.gov