**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

**UNITED STATES OF AMERICA**

v.                                              CASE NO.: 8:20-CR-309-SDM-AEP

**GLIB OLEKSANDR IVANOV-TOLPINTSEV**
_____/

**DEFENDANT'S SENTENCING MEMORANDUM IN SUPPORT OF
LOSS CALCULATION GUIDELINE OBJECTION AND
<u>REQUEST FOR A TIME SERVED SENTENCE</u>**

The Defendant, GLIB OLEKSANDR IVANOV-TOLPINTSEV, by and through his undersigned counsel, pursuant to 18 U.S.C. §§ 3551 and 3553(a), files this Sentencing Memorandum supporting his loss calculation guideline objection and respectfully requests this Honorable Court impose a sentence of time served followed by three years of supervised release. As grounds in support, Mr. Ivanov-Tolpintsev states the following:

**PROCEDURAL HISTORY**

A complaint alleging that Mr. Ivanov-Tolpintsev conspired to traffick in unauthorized access devices and in unauthorized computer passwords was filed on May 13, 2020. Doc. 1. On or about October 3, 2020, Mr. Ivanov-Tolpintsev was arrested in Korczowa, Poland on the warrant issued pursuant to the complaint above. On October 6, 2020, a four-count

indictment was filed charging Mr. Ivanov-Tolpintsev with conspiracy to traffick in unauthorized access devices and in unauthorized computer passwords in violation of 18 U.S.C. § 371, trafficking in unauthorized access devices in violation of 18 U.S.C. § 1029(a)(2) and (c)(1)(A)(i), and two counts of trafficking in unauthorized computer passwords in violation of 18 U.S.C. §§ 1030(a)(6)(A), (c)(2)(A) and 2. Doc. 4. On February 22, 2022, Mr. Ivanov-Tolpintsev entered a guilty plea to count one of the indictment pursuant to a written plea agreement. Docs. 36, 37. This Court accepted his guilty plea, adjudicated him guilty, and scheduled his sentencing hearing for May 12, 2022. Doc. 41.

### PRESENTENCE REPORT OBJECTION TO THE USE OF $500 PER ACCESS DEVICE LOSS CALCULATION PURSUANT TO USSG § 2B1.1 APPLICATION NOTE 3.(F)(i)

Mr. Ivanov-Tolpintsev has no criminal history and the Presentence Investigation Report (PSR) prepared in this case appropriately identifies him as a criminal history category I offender. PSR ¶ 49. The commentary to the guidelines expands the text of § 2B1.1 and directs that in cases involving counterfeit or unauthorized access devices, each access device must be

assigned a fictional minimum loss value of at least $500. U.S.S.G. § 2B1.1, App. N. 3(F)(i).[1] In this case, this arbitrary and fictional assignment of $500 per access device has caused an inflated intended loss amount of $3,352,000, which creates an astounding 16-level enhancement of Mr. Ivanov-Tolpintsev's offense level loss calculation. PSR ¶32. Once the additional enhancements are added for the number of victims, for a substantial part of the offense being committed from outside the United States, and for the offense involving the trafficking of unauthorized access devices, Mr. Ivanov-Tolpintsev's adjusted offense level is 28. PSR ¶¶33-39. After a three-level reduction for acceptance of responsibility, Mr. Ivanov-Tolpintsev's total offense level is 25. PSR ¶¶ 41-43. With a total offense level of 25 and a Criminal History Category of I, Mr. Ivanov-Tolpintsev's guidelines range of imprisonment is an exorbitant 57-60 months.

Consistent with the Sixth Circuit's opinion in *United States v. Riccardi*, 989 F.3d 476 (6th Cir. 2021), and the Supreme Court's opinions in *Stinson v. United States*, 508 U.S. 36 (1993), and *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), Mr. Ivanov-Tolpintsev objects to his loss being calculated under Application Note 3(F)(i) to U.S.S.G. § 2B1.1. To understand why this Court

---

[1] U.S.S.G. § 2B1.1, App. N. 3(F)(i) provides in relevant part, "[i]n a case involving any counterfeit access device or unauthorized access device, loss includes any unauthorized charges made with the counterfeit access devices or unauthorized access devices and shall be not less than $500 per access device."

must follow the Sixth Circuit's lead in *Riccardi* and thus sustain Mr. Ivanov-Tolpintsev's guidelines loss objection requires an understanding of the role the commentary to the guidelines currently plays given the Supreme Court's opinions in *Stinson* and *Kisor* and the historical interplay between the text of the guidelines (in this case U.S.S.G. § 2B1.1) and the commentary to the guidelines (in this case Application Note 3(F)(i)).

At its inception, the Sentencing Reform Act of 1984 tasked the Sentencing Commission with creating "guidelines" that contain sentencing ranges for various categories of offenses. 28 U.S.C. § 994(a)(1), (b)(1). These administratively created guidelines significantly affect individual liberty because Congress required district courts to follow them when choosing the length of a defendant's prison term. 18 U.S.C. § 3553(b)(1). Congress thus included several procedural due process safeguards to act as a check on the sentencing rules that the Sentencing Commission put into the guidelines.

Specifically, Congress required the Sentencing Commission to submit the original guideline for its review and to give it six months to review all amendments. *See* Sentencing Reform Act, § 235(a)(1), 98 Stat. at 2031-32; 28 U.S.C. § 944(p). While the guidelines since *United States v. Booker*, 543 U.S. 220 (2005) are advisory, they still significantly affect individual liberty because a court must use them as "the starting point and the initial

4

benchmark" for a proper sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007).

Besides promulgating the guideline text, the Sentencing Commission has also included "application notes" within the "commentary" to the guidelines. *See* U.S.S.G. § 2B1.1 cmt. nn. 1-8 (1987). As the original set of guidelines explained, the "commentary" may serve several purposes including that "it may interpret the guideline or explain how it is to be applied." *Id.* § 1B1.7.

The commentary differs greatly from the text of the guidelines. To amend the "commentary" the Commission need not follow the same procedures that govern changes to the text of guidelines themselves, which require congressional review and undergoing the notice-and-comment rulemaking process. That the Commission can amend the commentary without congressional review or undergoing the notice-and-comment process led some circuit courts to initially conclude that a sentencing court was not bound by the commentary's interpretation of the guidelines. *See Stinson v. United States,* 508 U.S. 36, 39-40 (1993) (discussing the circuits' early opinions about the guidelines and the weight, if any, to give to the commentary to the guidelines).

In 1993, the Supreme Court in *Stinson* rejected the view that district

5

courts are not bound by the commentary to the guidelines when it considered the question of how to classify the commentary to the sentencing guidelines and whether and when the commentary should be given binding interpretive effect. *Stinson* concluded that because the sentencing guidelines are written by the Sentencing Commission, a body that straddles both the legislative and judicial branches of government, the commentary to the guidelines is more like an agency's regulation than a statute. 508 U.S. at 44-45 (stating that "the guidelines are the equivalent of legislative rules adopted by federal agencies"). And it viewed the commentary as "akin to an agency's interpretation of its own legislative rules." *Id.* at 45. *Stinson* thus held that the commentary to the guidelines deserved the same deference given to an agency's interpretation of its own regulations. *Id.* at 45-46.

Relying on its prior opinion in *Bowles v. Seminole Rock & Sand Co*, 325 U.S. 410 (1945), *Stinson* found that an agency's interpretations of its own rules should enjoy deference "unless it is plainly erroneous or inconsistent with the regulation." 508 U.S. at 45 (quoting *Seminole Rock*, 325 U.S. at 414).[2] Applying the *Seminole Rock* or *Auer* test to the guidelines, in *Stinson*,

---

[2]*Seminole Rock* became shorthand for the doctrine of deference to an administrative agency's interpretation of its own regulation. *United States v. Nasir*, 17 F.4th 459, 470 n.12 (3d Cir. 2021) (en banc). More than 50 years later, in *Auer v. Robbins*, 519 U.S. 452 (1997), the Supreme Court reinforced this doctrine of deference to an administrative agency's interpretation of its own regulations. The deference doctrine is thus sometimes known as *Seminole Rock* deference and at other times called *Auer* deference.

the Supreme Court held that the commentary's interpretation of a guideline "must be given controlling weight unless it is plainly erroneous or inconsistent with the" guideline. 508 U.S. at 45. The Supreme Court also noted that the Commission could effectively amend a guideline by amending the commentary "if the guideline which the commentary interprets will bear the [amended] construction," particularly when the commentary is "interpretive and explanatory." *Id.* at 46-47. Later, the so-called *Seminole Rock* or *Auer* deference was held to govern the effect to be given to the guidelines' commentary.

*Stinson*'s plain-error test seemed to require courts to give great deference to the commentary unless to do so was clearly erroneous. *Riccardi*, 989 F.3d at 484. Post-*Stinson*, all the circuits, including the Eleventh Circuit, employed the *Stinson* plain-error deference standard when interpreting what weight to give a guideline's explanatory commentary. *See United States v. Wright,* 33 F.3d 1297, 1299 (11th Cir. 1994) (explaining that the guidelines commentary binds courts unless it "violate[s] the Constitution or a federal statute, or [is] inconsistent with, or a plainly erroneous reading of, the

7

applicable guideline").³

Recently, however, in *Kisor*, the Supreme Court clarified *Seminole Rock/Auer* deference in the related context of what weight to give an agency's interpretation of its regulations. 139 S. Ct. at 2414-18. In *Kisor*, the Supreme Court cut back on what had been understood to be uncritical and broad deference to an agency's interpretation of regulations and explained *Auer* or *Seminole Rock* deference should be applied **only** when a regulation is genuinely ambiguous. *Id.* at 2414-15.

The Supreme Court instructs in *Kisor* that "a court must carefully consider the text, structure, history, and purpose of a regulation, in all the ways it would if it had no agency to fall back on" **before** deferring to an agency's interpretation of its own rule or regulation. *Id.* at 2415. The Court explained, "[d]oing so will resolve many seeming ambiguities out of the box, without resort to *Auer* deference." *Id.* Thus, post *Kisor,* before deciding that a regulation is "genuinely ambiguous, [and deferring to the agency's own interpretation] a court must exhaust all the traditional tools of construction."

---

³ *See also United States v. Gallo*, 195 F.3d 1278, 1281 (11th Cir. 1999) (explaining that the "[g]uideline commentary must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation") (internal quotations omitted); *United States v. Cortes-Salazar*, 682 F.3d 953, 954 (11th Cir. 2012) (stating that "[s]entencing guidelines commentary explaining or interpreting the guidelines is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or plainly erroneous reading of, that guideline") (internal quotations omitted); *United States v. Hall*, 714 F.3d 1270, 1274 (11th Cir. 2013) (same); *United States v. Gordillo,* 920 F.3d 1292, 1297 (11th Cir. 2019) (same).

*Id.* (internal quotations omitted); *see also Riccardi,* 989 F.3d at 485 (applying *Kisor* to § 2B1.1 loss guideline and App. N. 3(F)(1)); *Nasir*, 17 F.4th 459 (applying *Kisor* to the career offender guideline (U.S.S.G. §4B1.2) and Application Note 1 defining "controlled substance offenses" to include inchoate offenses); and *United States v. Campbell,* 22 F.4d 438 (4th Cir. 2022) (same).

*Kisor* also explained that even when a regulation is ambiguous, there are limits to agency deference. The agency's reading must be "reasonable," as informed by "[t]he text, structure, history, and so forth," which "establish[es] the outer bounds of permissible interpretation." 139 S. Ct. at 2415-16 (internal quotations omitted). "[A] court must make an independent inquiry into whether the character and context of the agency interpretation entitles it to controlling weight," including whether it is the agency's "official position." *Id.* at 2416 (internal quotations omitted). Moreover, an agency's interpretation of its own regulation "must in some way implicate its substantive expertise" if it is to be given controlling weight, since "[s]ome interpretive issues may fall more naturally into a judge's bailiwick." *Id.* at 2417. Finally, reading the regulation, must "reflect fair and considered judgement" and not simply be a "convenient litigating position." *Id.* (internal quotations omitted).

9

Post-*Kisor*, the Third, Fourth, and Sixth Circuits have addressed its effect on the sentencing guidelines.[4] In *Nasir*, the Third Circuit examined the career offender guideline and the commentary's expansion of the "controlled substance offense" definition to include inchoate offenses. 17 F.4th at 468–72. Similarly, in *Campbell*, the Fourth Circuit, like the Third Circuit, examined the career offender guideline and the commentary's expansion of "controlled substance offenses" to include inchoate offenses. 22 F.4d at 444-47. Finally, in *Riccardi*, the Sixth Circuit examined the issue before this Court which relates to § 2B1.1's text and the commentary's expansion of the word "loss" when dealing with an access device offense. 989 F.3d at 479-93. The Third, Fourth, and Sixth Circuits reversed when the defendants' respective sentences were enhanced because the commentary to the respective guideline had expanded the non-ambiguous text of the guideline.

As the Third Circuit observed in *Nasir*, given *Kisor*, "the degree of deference to be given an agency's interpretation of its own regulations is now context dependent." *Nasir*, 17 F.4th at 471. As the concurrence put it, *Kisor*

---

[4] On February 18, 2022, the Eleventh Circuit in *United States v. Dupree*, No. 19-13776 (11th Cir.) granted rehearing *en banc* to address the effect of *Kisor* on the commentary to the guidelines in the context of the career offender guideline and the commentaries expansion of the definition of "controlled substance" offenses to include attempts and conspiracies, which the Third and Fourth Circuits have already resolved in *Nasir* and *Campbell*. Similarly, presently pending before the Fifth and Ninth Circuit in *United States v. Toliver*, 21-30246 (5th Cir) and *United States v. Kirilyuk*, 19-10447 (9th Cir.) is the issue presented before this Court related to the effect of *Kisor* on the $500 or more loss determination for access device fraud within the commentary to U.S.S.G. §2B1.1 which the Sixth Circuit in *Riccardi* has already resolved in Mr. Ivanov-Tolpintsev's favor.

10

must awake us "from our slumber of reflexive deference" to the guideline's commentary. *Id.* at 472 (Bibas, J., concurring in part). Similarly, the Fourth Circuit recently observed that the holding in *Kisor* "limited when courts will afford *Seminole Rock/Auer* deference" and "substantially cabining the circumstances under which courts defer to an agencies interpretation of their own rules. *Campbell*, 22 F.4d at 445.[5]

Applying *Kisor* to § 2B1.1's determination of "loss" when dealing with access device offenses, like the Sixth Circuit recently did in *Riccardi*, reveals that a sentencing court can no longer apply the "$500 or more" directive found in Application Note 3(F)(i). And if the Commission wants such a loss calculation in access device offenses, the Commission must amend the text of the guideline and not include such an expansive definition of "loss" in the commentary.

As the Sixth Circuit explained, the text of §2B1.1, which underwent the notice-and-comment rulemaking due process requirements, directs that "if

---

[5] While the Eleventh Circuit has recently granted rehearing *en banc* in *United States v. Dupree*, No. 19-13776 (11th Cir.) to address the effect of *Kisor* on the weight to be given the commentary of the career offender guideline, the Eleventh Circuit has fallen in lock step with *Kisor*'s newly clarified deference directive in the administrative law context. *See Callahan v. U.S. Dept. of HHS Through Azar*, 939 F.3d 1251, 1259 (11th Cir. 2019) ("As the Supreme Court recently held in *Kisor v. Wilkie*, deference "is not the answer to every question of interpreting an agency's rules."); *United States v. U.S. Stem Cell Clinic*, LLC, 998 F.3d 1302, 1308 (11th Cir. 2021) ("There was a time when a court faced with a regulation that seemed 'impenetrable on first read' might simply 'waive the ambiguity flag' and defer to the agency's interpretation. No longer. The Supreme Court recently clarified that judicial deference is appropriate only if a regulation is 'generally ambiguous.'").

11

the loss exceeded $6,500, increase the offense level" according to an ascending loss table from more than $6,500 up to more than $550,000,000. *See* U.S.S.G. § 2B1.1(b)(1)(A)-(P). As observed by the Sixth Circuit, despite this clear and unambiguous directive, Application Note 3(F), which was not subject to the notice-and-comment process, directs that these special rules must help determine loss in certain cases. Specifically, Application Note 3(F)(i) provides:

> **Stolen or Counterfeit Credit Cards and Access Devices; Purloined Numbers and Codes.**—In a case involving any counterfeit access device or unauthorized access device, loss includes any unauthorized charges made with the counterfeit access device or unauthorized access device and shall be not less than $500 per access device. However, if the unauthorized access device is a means of telecommunications access that identifies a specific telecommunications instrument or telecommunications account (including an electronic serial number/mobile identification number (ESN/MIN) pair), and that means was only possessed, and not used, during the commission of the offense, loss shall be not less than $100 per unused means. For purposes of this subdivision, **"counterfeit access device"** and **"unauthorized access device"** have the meaning given those terms in Application Note 10(A).

As *Kisor* clarified, a sentencing court should not reflexively defer to the commentary. Instead, it should defer to the Commission's commentary interpretation of the guidelines **only** if the guideline's text is ambiguous. *Riccardi*, 989 F.3d at 486 ("We thus do not immediately defer to Application Note 3(F)(i). Rather, we first ask whether § 2B1.1 is 'generally ambiguous.'")

(citing *Kisor*, 139 S. Ct. at 2415). As the Sixth Circuit decision in *Riccardi* correctly found, the text of §2B1.1 is not ambiguous and so, post-*Kisor,* a sentencing court cannot defer to the commentary's directive. *Id.* As observed by the Sixth Circuit:

> We need not decide whether one clear meaning of the word "loss" emerges from the potential options after applying "the 'traditional tools' of construction" to § 2B1.1. No matter the word's meaning, the commentary's $500 minimum loss amount for gift cards does not fall "within the zone of [any] ambiguity" in this guideline. No reasonable person would define the "loss" from a stolen gift card as an automatic $500. Rather, the "amount" of the loss or "damage" to the victim from a gift-card theft in any case will turn on such fact dependent things as the value of the gift card or the cost to replace it.

*Id.* (internal citations omitted).

As the Sixth Circuit further elaborated, "the commentary's bright-line $500 loss amount cannot 'be derived from [§2B1.1] by a process reasonably described as interpretation.'" *Id.* at 487. (internal citation omitted). "The Commission's decision to adopt this minimum loss amount was instead a substantive policy choice, one presumably based on empirical factors like the difficulty of determining actual loss in cases involving 'access devices' or the 'average' loss in those cases. Yet if the Commission seeks to keep individuals behind bars for longer periods of time based on this type of 'fictional' loss amount, this substantive policy decision belongs in the guidelines, not in the commentary." *Id.* (citation omitted).

Finally, as observed by the Sixth Circuit, if the Commission wants to determine loss at $500 per access device or higher, it can do so, but it must first amend the text of the guidelines and defend the due process protections of the notice-and-comment rulemaking safeguards required to amend the guidelines. *Id.* at 488-489.

Thus, post-*Kisor*, the commentary to the guidelines may only interpret the guidelines—it cannot expand or amend them. The commentary in Note 3(F)(i) requiring a $500 mandatory minimum loss determination for access device fraud cases cannot be described as *interpreting* the word "loss" in the U.S.S.G. § 2B1.1. Rather, a substantive legislative rule would need to arise from the guideline itself to have any lawful force on a sentencing court.[6]

As in *Riccardi*, here, because Note 3(F)(i) expands and does not interpret the text of the § 2B1.1 guideline, this Court cannot apply the 3(F)(i) "at least $500" per access device loss determination directive, and instead it must determine loss based on the actual loss amount caused by Mr. Ivanov-Tolpintsev's unlawful actions under the non-ambiguous directive of the text

---

[6] To date, the Sixth Circuit is the only appellate court to issue a published opinion addressing the Application Note 3(F)(i) in light of *Kisor*. This issue is presently pending in the Fifth Circuit in *United States v. Toliver*, 21-30246 (5th Cir.) and Ninth Circuit in *United States v. Kirilyuk*, 19-10447 (9th Cir.). The Eleventh Circuit in a recent unpublished decision declined to address the issue based upon on the invited error doctrine. *See United States v. Carlos Ernesto Del Pino*, 2022 WL 414394 (11th Cir. 2022).

of § 2B1.1(b)(1).[7] Because the government cannot establish by a preponderance of the evidence a loss greater than the $82,648 received by Mr. Ivanov-Tolpintsev, pursuant to § 2B1.1(b)(1)(D), the loss enhancement in Mr. Ivanov-Tolpintsev's guideline calculation should be an additional 6 levels, instead of 16. As a result, his total offense level is 15.

### REQUEST FOR A REASONABLE SENTENCE PURSUANT TO 18 U.S.C. § 3553(a)

Based on the argument above, with a total offense level of 15 and a criminal history category I, Mr. Ivanov-Tolpintsev's advisory guideline imprisonment range is 18 to 24 months. A sentence of over 19 months' time served followed by three years of supervised release would constitute a sentence "which is sufficient but not greater than necessary" to accomplish the purposes of sentencing.

### I. The nature and circumstances of the offense

The Marketplace was a dark web website, in operation from around October 2014 until around January 2019, that illegally sold personally identifiable information and access credentials of compromised computer servers. PSR ¶ 18. During that timeframe, the Marketplace offered over

---

[7] Concurring in *Riccardi*, Judge Nalbandian stated that Note 3(F)(i) is unenforceable based on only *Stinson*—without the need to resort to *Kisor*. 989 F.3d at 490–93 (Nalbandian, J., concurring in part and in the judgment). Mr. Ivanov-Tolpintsev maintains that the majority opinion in *Riccardi* correctly applied *Kisor*. But whether this Court agrees with the *Riccardi* concurrence or the *Riccardi* majority, the result remains the same. Note 3(F)(i) is unenforceable.

15

700,000 compromised servers for sale, including at least 150,000 in the United States, 8,000 of which were in Florida. PSR ¶ 19. The administrators of the Marketplace would grant access to sellers to list the credentials of servers they illegally obtained for sale on the Marketplace. PSR ¶¶ 20, 21. Mr. Ivanov-Tolpintsev was one of those sellers. From January 8, 2017, until January 15, 2019, Mr. Ivanov-Tolpintsev listed 6,704 servers for sale on the Marketplace. PSR ¶ 22. That amounts to less than 1% of the total servers listed during the Marketplaces' existence. For the servers he listed, he obtained $82,648. *Id.* Some of which he kept, and some went to at least one of the administrators of the Marketplace.

## II. The history and characteristics of Glib Oleksandr Ivanov-Tolpintsev

Mr. Ivanov-Tolpintsev was born in Chernivtsi, Ukraine on June 10, 1993. PSR ¶ 53. He grew up in a loving, two-parent household and all his basic needs were met. *Id.* He was afforded the opportunity to go to college and he received his bachelor's degree in architecture from Lviv National Agricultural University in 2016. PSR ¶ 62. Mr. Ivanov-Tolpintsev hoped to work in construction following his graduation, but he grew bored of the profession. Both prior to and after his graduation from college, he worked at his father's engine oil and filters company. PSR ¶¶ 54, 64. He has no criminal history prior to the commission of this offense. PSR ¶¶ 46-52.

### III. The need for the sentence imposed to provide just punishment for the offense

A sentence of time served for the over 19 months that he has been imprisoned followed by three years of supervised release is just punishment for this first time, criminal history category I offender. In considering a just punishment for this offense, Mr. Ivanov-Tolpintsev asks this Honorable Court to consider the United States Sentencing Commission's analysis of the sentences imposed in theft, fraud, and similar cases involving the type of harm occurring in this case pursuant to the use of USSG § 2B1.1. For the fiscal year 2020, the average sentence length was 21 months imprisonment.[8] Of the offenders that received a downward variance, the average sentence reduction was 58 percent.[9]

### IV. The need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct

To avoid an unwarranted sentencing disparity, this court should sentence Mr. Ivanov-Tolpintsev to time served followed by three years of supervised release. Pavlo Kharmanskyi (Kharmanskyi), a Ukrainian citizen, was one of the administrators of the Marketplace. 8:18-cr-546-TPB-AEP, Doc. 44 at page 22. Kharmanskyi was indicted under two cases for his

---

[8] *See* https://www.ussc.gov/research/quick-facts/theft-property-destruction-fraud, Last visited April 12, 2022.
[9] *See Id.*

17

conduct involved in his administration of the Marketplace: 1) 2:18-cr-721-SRC (DNJ), jurisdiction of which was transferred to the Middle District of Florida under case 8:20-cr-316-TPB-JSS and 2) 8:18-cr-546-TPB-AEP. Under those two cases, Kharmanskyi pleaded guilty to wire fraud and possession of unauthorized access devices respectively. Despite having a guideline range of 97-121 months' imprisonment, after receiving an 11-level departure pursuant to the government's 5K1.1 motion, for his conduct he received a concurrent sentence of approximately 30 months' time served followed by three years of supervised release. *See* 8:18-cr-546-TPB-AEP, Docs. 69, 74 and 8:20-cr-316-TPB-JSS, Docs. 15, 20.

Mr. Ivanov-Tolpintsev, who was but a seller on the Marketplace that Kharmanskyi played an integral part in administrating, surely should not receive a *greater* sentence than Kharmanskyi. *See* 8:18-cr-546-TPB-AEP, Doc. 44 at page 22.

WHEREFORE the Defendant, GLIB OLEKSANDR IVANOV-TOLPINTSEV, respectfully requests this Honorable Court impose a sentence of time served followed by three years of supervised release.

Respectfully submitted this 11th day of May 2022.

                                      A. FITZGERALD HALL, ESQ.
                                      FEDERAL DEFENDER

By: **_s/ Adrian E. Burden_**
      Adrian E. Burden, Esq.
      Assistant Federal Defender
      Florida Bar No. 0089781
      400 North Tampa Street,
      Suite 2700
      Tampa, Florida 33602
      Phone: (813) 228-2715
      Facsimile: (813) 228-2562
      Email: Adrian_Burden@fd.org

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 11th day of May 2022, a true and correct copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system, which will send a notice of the electronic filing to:

AUSA Carlton Gammons

By: **_s/ Adrian E. Burden_**
Adrian E. Burden, Esq.
Assistant Federal Defender