UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,

     Plaintiff,

    v.

GLIB O. IVANOV-TOLPINTSEV

     Defendant

Case # 8:20-cr-309

MOTION FOR COMPASSIONATE RELEASE/
REDUCTION IN SENTENCE UNDER
18 USC §3582(c)(1)(A)(i)

NOW COMES the Defendant, Glib Oleksandr Ivanor-Tolpintsev, acting pro se and in forma pauperis, with a Motion for Compassionate Release/Reduction in Sentence under 18 USC §3582(c)(1)(A)(i).

November 17, 2022

Respectfully submitted,

Glib O. Ivanov-Tolpintsev
Pro se, in forma pauperis

Defendant, Glib O. Ivanov-Tolpintsev, acting pro se and in forma pauperis, hereby moves the Court for immediate release. Federal law provides that a court can reduce a term of imprisonment in certain cases. This is found in Title 18 of the United States Code, Section 3582(c)(1)(A)(i), commonly known as the "compassionate release" statute. Prior to December 2018, the court could only grant compassionate release upon a motion of the Director of the Bureau of Prisons (BOP). This gave the BOP sole discretion over whether or not to grant release to an inmate. The BOP's denials often override the opinions of those closest to the prisoner, like their doctors and wardens.

In December 2018 President Trump signed the First Step Act into law. The First Step Act gives inmates the right to petition the courts directly for compassionate release. As a result, the compassionate release statute now reads:

(A) the court, upon the motion of the Director of the BOP, or upon motion of the defendant after the defendant has fully exhausted all administrative remedies (right) to appeal the failure of the BOP to bring a motion on the defendant's behalf, or on the lapse of thirty days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or super-vised release with or without conditions that do not exceed the unserved portion of the original term of imprisonment), after con-sidering the factors set forth in Section 3553(a) to the extent that they are applicable if it finds that:

(i) extraordinary and compelling reasons warrant such a reduction or;

(ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under Section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the BOP that the defendant is not a danger to the safety of any person or the community as provided under Section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by the sentencing commission.

Subsection (A)(i) reads "extraordinary and compelling circumstances warrant such a reduction". This subsection, however, is not further defined or explained, and as will be explained in the cases below, the applicable Commission guidelines, USSG 1B1.13, have not been updated to provide further guidance. This means that in certain districts inmates may be able to receive relief by directly petitioning the court under 18 USC §3582(c)(1)(A). Section 3582(c)(1)(A) permits the district court to reduce sentences (including terms of supervised release) on the grounds the extenuating and compelling circumstances warrant such a reduction. §3582(c)(1)(A)(i), "Extraordinary and Compelling Reasons", are in turn defined by the commentary in policy statement USSG Manual 1B1.13 (see Appendix E). That commentary currently lists four categories of such reasons: (1) the defendant's medical condition; (2) age; (3) the defendant's family circumstances; and (4) other reasons... The Petitioner is requesting a reduced sentence based on (1) the defendant's current medical condition, (2) the defendant's age, and (4) other reasons.

The First Step Act of 2018 expressly permits sentencing courts to "impose a reduced sentence" for the defendants who are convicted of covered offenses. US v. Martin, 2019 US DIST. LEXIS 89940, n.7, (E.D.NY, 2019). Although no definition can be found for "Extraordinary and Compelling Reasons", Black's Law Dictionary defines "extraordinary" as "beyond what is usual, customary, regular, or common." Black's Law Dictionary, (11th Ed., 2019). Black's Law Dictionary defines "compelling need" as one "so great that irreperable harm or injustice would result if it is not met." Id.

The First Step Act did not change the statutory criteria for compassionate release, but it did change the procedures, so that the BOP is no longer an obstacle to a court's consideration of whether compassionate release is appropriate. US v. Fox, 2019 US DIST. LEXIS 115388, n.4, (DIST.ME, 2019). One district court has concluded that this policy statement (referring to the US Sentencing Commission policy statement) "provides helpful guidance", but "does not constrain the court's independent assessment", and "it is consistent with the old policy statement and with the Commission guidance more generally for courts to exercise similar discretion as that previously reserved to the BOP director in evaluating motions by defendants for compassionate release." Id. See US v. Beck, 2019 US DIST. LEXIS 108542 (M.D. NC, 2019); US v. Cantu, 2019 US DIST. LEXIS 100923 (S.D.TX, 2019); US v. Sutelo, 2019 US DIST. LEXIS 135051 (E.D.PA, 2019); US v. Johns, US DIST. LEXIS 107850 (D.AZ, 2019).

In US v. Cantu, 2019 US DIST. LEXIS 100923 (S.D.TX), Cantu pled guilty to one count of racketeering and was originally sentenced to 290 months in prison. He sought release under 18 USC 3582, asking for a reduction in

sentence to time served to indicate that 30 days had elapsed from his re-
duction in sentence request to the Warden and a response. In a section
entitled "Increasing the Use and Transparency of Compassionate Release",
the First Step Act amended §3582(c)(1)(A) to allow courts to modify sentences
not only upon the motion of the Director of the BOP, but also upon "motion
of the defendant after the defendant has fully exhausted all administrative
remedies to appeal a failure of the BOP to bring a motion on the defendant's
behalf or the lapse of 30 days from the seat of such a request by the warden
of the defendant's facility." §603(b), 132 Stat. at 5239. The policy state-
ment regarding compassionate release sets forth three specific reasons that
are considered "extraordinary and compelling", as well as the catch-all
provision recognizing as "extraordinary and compelling" any other reasons
as determined by the Director of the BOP.

The court in Cantu examined USSG 1B1.13 to determine what the Sentencing
Commission considers "extraordinary and compelling". While Cantu had not
presented evidence about why his reasons were extraordinary and compelling,
the court determined that they had the power to make that determination.
This was in part because the First Step Act's enactment meant that the
policy statement (USSG 1B1.13) was no longer applicable to the statute and
meant that the policy statement did not provide guidance on the appropriate
use of sentence modification provisions under §3582. The court also relied
on the Rule of Lenity, which in this situation mandates that "when two
rational readings of a statute are possible, the one that treats the de-
fendant less harshly prevails", citing McNally v. US, 483 US 350, 359-60,
(1987). Finally, the court determined that the statute did not define or
place any limits on what "extraordinary and compelling reasons" might warrant

a reduction, citing <u>Crowe v. US</u>, 430 F. Appx. 484, 485 (6th C., 2011).

As stated, the <u>Cantu</u> court also determined that the statute did not define or place any limits on what "extraordinary and compelling reasons" might warrant such a reduction, citing <u>Crowe v. US</u>, 430 F. Appx. 484, 485 (6th C., 2011). Having determined that they had the authority to grant relief, the court determined that there were extraordinary and compelling reasons present in the case that warranted a reduction in sentence under §3582(c)(1)(A). Also, it is worth noting that the government's statement admitted that the court could issue an order that would cause the BOP to release the defendant. The court granted the release and amended his sentence to time served.

In <u>US v. Beck</u>, 2019 US DIST. LEXIS 108542 (M.D.NC, 2019), the court noted that there is no policy statement applicable to motions for compassionate release filed by defendants under the First Step Act. The court said the Sentencing Commission has not amended nor updated the old policy statement since the First Step Act was enacted, and that it was unlikely that they would soon, given that the US Sentencing Commission does not have sufficient members to vote to amend the guidelines. The court further determined that "courts may, on motions by the defendants, consider whether a sentence reduction is warranted for extraordinary and compelling reasons <u>other than those specifi-cally identified</u> in the application notes to the old policy statements."

In <u>US v. Urkevich</u>, 8:03-cr-37, 2019 WL 6037391, (DIST. Nebraska, 2019) the court noted that "the <u>commentary</u> describes certain circumstances under which 'extraordinary and compelling reasons' for a reduction of sentence are deemed to exist, but the commentary does not suggest the list is exclusive. Application

Note 1(D) [see Appendix E], titled 'Other Reasons', is a catch-all provision, nothing that the Director may determine that "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).'" The court also stated that other courts have concluded that the Commission's failure to amend USSG §1B1.13 does not preclude a court from acting on motions using the Application Note 1(D) "catch-all provision". The court used this provision and reasoning to determine that the court's contemplation of a reduction in Urkevich's sentence is consistent with the Commission's policy statements.

The Second Circuit held in US v. Zullo, 976 F.3d 228, 237 (2nd Cir., 2020) that, absent updated guidance from the Sentencing Commission, the FSA freed district courts to consider any potentially extraordinary and compelling reason that a defendant might raise for compassionate release. Neither the USSG Manual §1B1.13, Application n.1(D), nor anything else in the now outdated version of §1B1.13, limits the district court's discretion. Turning to the text of Guideline §1B1.13, it is manifest that its language is clearly outdated and cannot be fully applicable. The very first words of the Guideline are "upon the motion of the Director of the BOP". (USSG §1B1.13). And that is precisely the requirement that the FSA expressly removed. See 18 USC §3582(c)(1)(A); Zullo at *235. See also US v. Aruda, 993 F.3d 797, 802 (9th Cir., 2021) and US v. Zacarias, 2022 US Dist. LEXIS 21940 (E.D.CA, 2022). Some courts have acted preemptively in an effort to get ahead of the game. (See Appendix A).

In the case at hand, the Petitioner has numerous extraordinary and compelling reasons to bring to the Court's attention, beginning with:

## A. Prison Conditions

The defendant states that during his entire incarceration the BOP has been providing him with inadequate care with respect to diet, medical treatment, clothing, rehabilitation, and living conditions, resulting in an extraordinary and compelling reason. When a prisoner comes into FCI Loretto he is given used clothing—and that includes underwear, undershirts, and socks. Inadequate clothing is compounded by the fact that clothes often come back from the laundry smelling worse than they did before they were cleaned. Living conditions (room size, showers, toilets, and sinks) are not even close to what would be necessary to accomodate the number of inmates in the facility (see Appendix C). The Eighth Amendment places restraints on officials, who may not for example use excessive physical force against an inmate. It also imposes duties on these officials, who must provide humane conditions of confinement, ensuring that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmate.

An act violating a constitutional right cannot be justified by ignorance or disregard of settled law. In other words, an official/the BOP is held to a standard of conduct based not only on permissible intentions, but also on knowledge of the basic unquestionable constitutional rights of an inmate for whom the official/BOP is responsible. In cases involving prison conditions where the state of mind includes deliberate indifference, it requires proof of the official's knowledge of "both the inmate's serious condition as well as the excessive risk posed by the official's action or inaction." Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir., 2014) (citing Farmer v. Brennan, 511 US 825, 837-839 (1974)). A defendant can meet the subjective knowledge

requirement through direct evidence of a prison official's actual knowledge, or via circumstantial evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." Makdessi v. Fields, 787 F.3d 126, 133 (4th Cir., 2015) (quoting Farmer at *842).

A prison official violates the Eighth Amendment by "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 US 97, 106 (1976). The taxonomy of deliberate indifference claims recognized in the 3rd Circuit includes cases where (1) prison authorities deny reasonable requests for medical treatment; (2) knowledge of the need for medical care is accompanied by the intentional refusal to provide it; (3) necessary medical treatment is delayed for non-medical reasons; and (4) prison authorities prevent an inmate from receiving recommended treatment for serious medical needs. Pearson v. Prison Health Services, 850 F.3d 526, 538 (3rd Cir., 2017). A defendant is deliberately indifferent when he "knows of and disregards an excessive risk to inmate health or safety..." Farmer v. Brennan, 511 US 825, 837 (1994). FCI Loretto specifically—and the BOP in general—are deliberately indifferent by design.

At FCI Loretto, prisoners live in an environment where everything is substandard, and that is by design. "Everything" includes education, programming, recreation, food service, commissary, religious services, and especially medical care. As stated, our living space does not have the required square footage, showers, toilets, or sinks for the ±900 individuals housed at FCI Loretto. The Government always insists on more time served as if it's some sort of panacea to what ails society, but nothing could be further from the truth—and it's difficult

to understand what the Government thinks will come of this. They obviously don't have an understanding of what type of environment exists in prisons. Inmates live in an environment where drug use and access to drugs is off the charts, violence and brutality are around every corner, and intercourse between males—both consensual and nonconsensual—is nothing short of rampant. For all of the reasons mentioned, including deliberate indifference, the Petitioner maintains they constitute extraordinary and compelling reasons.

B. COVID-19

COVID-19 was first identified in Wuhan, China in 2019, and was immediately considered to be highly contagious. In early 2020, the COVID-19 Alpha variant emerged, and was deadlier than the original virus. As COVID-19 began to mutate, the Beta variant was identified in South Africa in late 2020, but it did not spread to the US. In 2021 the Delta variant B1.617.2 spread especially among the unvaccinated, the CDC reported. By the end of 2021, Omicron BA.1 was detected in Botswana and South Africa. BA.4 and BA.5 made up over 50% of the cases in the US by July 2022. These variants had very high transmissibility and severity of disease, while vaccines offered little or no protection. Other variants being tracked by the CDC include Gamma, Epsilon, Eta, Iota, Kappa, Mu, Zeta, and 1.617.3. (Haendel, M.A., et al., "The National COVID Cohort Collaborative ($N^3C$): Rationale, design, infrastructure, & deployment", Journal of American Medicine Information Association, 28.427.443 (2022)). COVID is not a single homogenous disease. It is an ever-mutating virus with various rates of transmissibility, and both acute and post-acute sequelae (i.e. long COVID). The bottom line is that if you are older and have serious chronic health problems, the vaccines will not conclusively prevent you from falling

ill and dying. Furthermore, if you get sick, the BOP will not provide even
the necessary minimum level of care to assist in your recovery and conva-
lescence.

Dr. Anthony Fauci told Fox News TV host Neil Cavuto that "one of the things
that's clear from the data [is] that vaccines, because of the high degree
of transmissibility of this virus, don't protect overly well against infec-
tion." (Epoch, www.theepochtimes.com/facui-makes-surprising-concession-regarding-
covid-19-vaccines_4595318.html). According to the prestigious New England
Journal of Medicine, studies have shown that "the level of neutralizing anti-
bodies" that previous infections and/or vaccination create in the body are
less effective against the Omicron BA.4 and BA.5 subvariants. (www.nbcchicago.
com/news/coronavirus/ba-5-omicron-subvariant-spreading-quickly-could-become-
dominant-strain.www.nejm.org). In a subcommittee hearing on the BOP's COVID
management, Senators Alex Padilla (D-CA) and Dianne Feinstein (D-CA) sent
an open letter to the Department of Justice (DOJ). "The experience of the
pandemic for the federally incarcerated population remains starkly worse than
for non-incarcerated individuals," the letter said. The Department of Health
& Human Services (DHHS) reported that the BOP consistently declines additional
COVID-19 drugs. "We have reached out multiple times to BOP asking them why
they do not want their allocations offered by HHS. They consistently say they
have enough to meet demand/their demand is low," DHHS wrote in a May 4, 2022
email to Congress. (LISA Newsletter for August 1, 2022; www.lisa-legalinfo.com).

When the COVID-19 global pandemic hit the United States in 2020, the BOP gen-
erally and FCI Loretto specifically went in to "lockdown" in March of 2020.

(See Exhibit J-1). Initially, the inmates were confined into closed spaces within small cells filled with six adult males. Inmates were not allowed outside to socially distance. The units had anywhere from 150 to 200 men per unit, with insufficient common bathrooms and scarce hygiene products. The BOP staff were not tested for COVID (this hasn't changed), and were/are free to go from unit to unit spreading the virus. (See Exhibit B-6). Congress passed the CARES Act to allow the BOP to release nonviolent detainees to access 'home confinement'. However, the BOP dragged their feet and disqualified even the most severely ill inmates. When COVID-19 did hit the BOP institutions, the medical staff treated inmates with impunity, falsifying records in total indifference to the Hippocratic Oath.

"Social distancing can be difficult for individuals living or working in a prison." US v. Ullings, 2020 WL 2394096 at *3 (N.D.GA, 2020) (citing New England Journal of Medicine, "Flattening the curve for incarcerated population—COVID-19 in jails and prisons." (April 9, 2020)). A recent case recognized that "detained populations also tend to be in poorer health and suffer from a higher prevalence of infectious and chronic diseases than the general population. And to make matters worse, medical care of prisoners is often limited at the best of times." Ullings, at *3 (internal citations omitted). See also US v. Robert Richards, case no. 1:07-cr-00412-CAP-18 (2020).

Conditions of confinement at the defendant's prison (and in prisons in general) create an optimal environment for the transmission of a contagious disease. People who work in these facilities leave and return daily; people deliver supplies to these facilities daily; inmates having legal and medical visits

after the initial spread of the virus created/will create an atmosphere in which large numbers of prisoners become infected. Public health experts opine that incarcerated individuals are at a special risk of infection given their living situations, and may also be less able to participate in proactive measures to keep themselves safe; the ability to control the spread of infection is limited at best. As described by Dr. Jamie Meyer, an infectious disease specialist at the Yale School of Medicine, inmates are uniquely vulnerable; the risk posed by infectious disease in jails and prisons is signifi cantly higher than in the community, both in terms of risk of transmission/ exposure, and harm to individuals who become infected.

Dr. Meyer goes on to describe the inadequate pandemic preparedness plans in many detention facilities, and the difficulty of separating infected or symptomatic inmates from others. The COVID-19 virus is highly transmissible, dangerous, and poses a real threat to all prisoners. According to the University of Chicago School of Medicine, in a small and seemingly random group of people with COVID-19, the virus travels into organs and damages them, sometimes so severely that a transplant is required. Also, the way people respond to COVID-19 is unpredictable—and this includes those who don't knowingly have high-risk conditions. (The Forefront, uchicagomedicine.org (Fall 2021)). Courts have recognized that BOP statistics understate any potential rate of COVID infection because "BOP still does not perform regular, universal testing of prisoners and staff." US v. Sherrod, 2021 WL 3473236 at *4 (E.D.MI, 2021) (according "no weight" to the BOP's low reported rate of COVID infections; see also US v. Amarrah, 2020 WL 2220008 (E.D.MI, 2020)).

In US. v. Raia, 954 F.3d 594, 596 (3rd Cir., 2020), Raia filed his own motion with the district court seeking compassionate release given the global pandemic caused by COVID-19, a highly contagious virus which at that time had already infected over 25,000 people in New Jersey, and which poses unique risks in population-dense prison facilities. (See Fed. BOP COVID-19 Action Plan (March 2020)). The court granted relief. Other district courts have followed suit. The Southern District of New York granted compassionate release/reduction in sentence citing the conditions of confinement during the COVID-19 pandemic as one of the reasons for compassionate release. US v. Serrano, US Dist. LEXIS 82612 (S.D.N.Y., 2022). See also US v. Wright, 2022 US Dist. LEXIS 40176 (S.D.Ca., 2022). In US v. Hale, case no. 10-cr-1032 (ECF 184) (S.D.TX., 2022), the court found that the pandemic, combined with the prison's difficulties in responding to it, can constitute an extraordinary and compelling reason.

## C. Vaccine

Vaccines are no panacea, and work by eliciting an umminue response ahead of a potential infection. Recently, The Lancet published a study on the effectiveness of COVID-19 vaccines and the waning of immunity with time. The study showed that immune function among vaccinated individuals 8 months after the administration of two doses of COVID-19 vaccine was lower than that among the unvaccinated individuals. According to European Medicines Agency recommendations, frequent COVID-19 booster shots could adversely affect the immune response and may not be feasible. The decrease in immunity can be caused by several factors such as N1-methylpseudouridine, the spike protein, lipid nanoparticles, antibody-dependent enhancement, and the original antigenic stimulus. These clinical alterations may explain the association reported between COVID-19 vaccination

and shingles. As a safety measure, further booster vaccinations should be dis-
continued. In addition, the date of vaccination should be recorded in the medi-
cal record of patients. Several practical measures to prevent a decrease in
immunity have been reported. These include limiting the use of non-steroidal
anti-inflammatory drugs, as well as acetaminophen, to maintain deep body tem-
perature, appropriate use of antibiotics, smoking cessation, stress control,
and limiting the use of lipid emulsions—including the general anaesthetic
propofol—which may cause perioperative immunosuppression. In conclusion, COVID-
19 vaccination is a major factor for infections in chronically ill patients.
(virologyj.biomedcentral.com/articles/10.1186/s12985-022-01831-0). Furthermore,
immune response is not the same in all individuals. Age (older equating to poorer
immune response), chronic health conditions, and overall health all affect the
type and degree of immune response. Younger, healthier individuals have a more
robust immune response, and the opposite is also true. In healthy subjects,
COVID-19 vaccines provided at best 3-4 months of protection. According to David
Dowdy, an epidemiologist at Johns Hopkins Bloomberg School of Public Health
in Baltimore, "it's not that after 90 days suddenly you become fully susceptible
[to infection]. It's really that in 60 days you are somewhat susceptible, and by
120 days you're even more susceptible." Some experts, like Howard Medical School's
Dr. Daniel Krutzkes, Chief of Infectious Diseases, believe as new variants emerge,
the window will continue to change. "This is going to be a constantly changing
parameter," he says. (See Exhibit Alpha).


Peer-reviewed studies and news articles show COVID-19 vaccinations and boosters
are not the panacea the pharmaceutical industry and the government claim they
are:

1. <u>Nature</u>: Ziyad Al-Aly of VA St. Louis Healthcare System: "...disappoin-ting...I was hoping to see that vaccines offer more protection, especially given that vaccines are our only line of defense nowadays." (www.nature.com/articles/s41591-022-01840-0);

2. <u>Epoch</u>: Dr. Anthony Fauci told Fox News "...one of the things that's clear from the data [is] that vaccines, because of the high degree of transmissibility of this virus, don't protect overly well, as it were, against infection." (www.theepochtimes.com/fauci-makes-surprising-confession-regarding-covid-19.vaccines_4595318.html);

3. <u>Louisiana Department of Health</u>: "...higher percent of vaccinated people have died than those that were unvaccinated." (ldh.la.gov/coronavirus/);

4. <u>CDC</u>: Effectiveness of COVID-19 vaccine booster doses dropped well under 33% after 4 months. (www.cdc.gov/mmwr/volumes/71/wr/mm7/29e1.htm?s_cid=mm7129e1_w);

5. <u>UK ONS</u>: Reinfections were 10 times higher during the recent Omicron outbreak compared with earlier Delta outbreak. (ons.uk.gov);

6. <u>Wall Street Journal</u>: "...leftover reservoirs of virus could be provo-king the immune system in some people, causing complications such as blood clots and inflammation, which may fuel certain long COVID symptoms up to a year after infection." (www.wsj.com/articles/a-key-to-long-COVID-is-virus-lingering-in-the-body-scientists-say-11662590900);

7. <u>CDC</u>: Living in prisons and jails puts you at higher risk for getting COVID-19 because there may not be enough space to keep people with COVID-19

away from others. Staff, visitors, and/or other inmates may have the virus and not know it. (www.cdc.gov/coronavirus/2019-ncov/downloads/needs-extra-precautions/For-People-Living-in-Prisons-and-Jails.pdf).

The large number of mutations help the COVID-19 virus escape antibodies elicited by vaccination or prior infection. (See Exhibit Beta). Per a study in the prestigious journal Science, published February 18, 2022, "...this means people get COVID-19 multiple times, raising the risk of long COVID and a host of lingering symptoms," according to Andrew Romano of Yahoo News. (Exhibit Delta). In fact, Dr. Anthony Fauci, President Joe Biden's former chief medical adviser, told Barrons that "COVID-19 won't be eradicated, and even those who are vaccinated will keep getting it." (See Exhibit Epsilon).

More data is emerging that shows that vaccinations and boosters result in a higher likelihood of infections, and reinfections—with a shorter window in between. Even the Center for Disease Control and Prevention (CDC) lists adverse reactions from COVID-19 vaccinations and boosters, which include:

1. Allergic reactions, including anaphylaxis;

2. Thrombosis with thrombocytopenia—blood clots in large blood vessels, and low platelet count;

3. Cerebral Venous Sinus Thrombosis—blood clot of the brain;

4. Guillain-Barre Syndrome—wherein the body's own immune system attacks nerve cells, causing muscle weakness and paralysis. Most prevalent in men 50 years old and older. Vaccine Safety Datalink

reports GBS is most prevalent 21 days following vaccination.

5. Myocarditis and pericarditis—inflammation of heart muscle and heart sac;

6. Death—although rare, it is not insignificant if you are the one dying. VAERS (Vaccine Adverse Events Reporting System) through May 20, 2022 reported 13,045 deaths from COVID-19 vaccination. (open vaers.com/covid-data).
(www.cdc.gov/coronavirus/2019-ncov/vaccines/safety/adverse-events.html).

Interestingly, there have been no peer-reviewed scientific reports published that prove that vaccinated individuals get milder symptoms—but there are plenty of reports of serious side effects of those who got vaccinated. "I don't think we should make any bets on someone who has a reinfection having a less likelihood of having long COVID," says Dr. Amy Duckro to the Wall Street Journal. (www.wsj.com/articles/covid-19-twice-immunity-reinfection-vaccine-1651013266).

It has been hypothesized that there will be an increase in cardiovascular diseases among the global population—especially acute coronary syndromes—caused by the spike proteins in genetic vaccines. Besides the risk of infections owing to lowered immune functions, there is a possible risk of unknown organ damage caused by the vaccine that has remained hidden without apparent clinical presentations, mainly in the circulatory system. In summary, COVID-19 vaccination, particularly the use of mRNA vaccines and bivalent boosters, is in and of itself a major risk factor for morbidity and mortality in individuals with chronic health problems and other risk factors.

## D. Medical

Today, there is supposed to be a <u>standard of care</u>—and it is the minimum ethical yardstick by which a physician's management of their patient's care is judged. The physician is trained to follow certain protocols, such as 'ruling out' conditions that are likely to cause serious damage/death by ordering tests appropriate to the complaints. The other way to practice medicine is to order the cheapest test and the one least likely to be positive. Practicing this latter type of management is only possible if the clinicians are legally protected from prosecution, such as those working for the federal government. The care given to the Defendant highlights such egregious and substandard treatment.

### i. Healthcare Provider Credentialing

After completing 4 years of college, medical doctors are required to complete 4 more years of medical school and 3-7 years of additional internship, residency, and fellowship training. Physicians in general, family, and internal medicine are trained to treat adult patients. Pediatricians are trained to treat children. Other specialties require fellowship training to treat disease related to cardiology, endocrinology, gastroenterology, orthopedics, neurology, neurosurgery, opthamology, and many other specialties. (<u>Johnson Memorial Health Blog</u>; www.acponline .org).

The Medical Director—and only physician—at FCI Loretto is Dr. Kim D. Swindell. According to US News, Dr. Swindell is a pediatric infectious disease specialist, whom according to his website treats "children with

a broad array of diseases caused by germs, viruses, and fungi, ranging from flu to hospital-acquired infections to pneumonia." (health.usnews .com).

Dr. Swindell is not trained to treat adult patients. Under his direction are 4 physician's assistants: PAs Burk, Krepps, Golden, and Hoover. The Health Services Administrator (HSA), Norman Weidlich, manages the allocation of services for the medical department, and Seven Corners is the insurance provider. HSA Weidlich's only training is as an emergency medical technician (EMT). EMT training is mostly weekend courses, which have very rudimentary training in pathology and in no way offer the comprehensive training required of a physician. The HSA has the ultimate power to deny care, overruling PAs and the physician at FCI Loretto. HSA Weidlich exercises his denial-of-treatment power regularly. HSA Weidlich, PA Burk, and Dr. Swindell denied FCI Loretto inmate John Doe's request issued by a medical expert from FMC Butner to transfer Doe to the medical center. John Doe v. US, 2022 US Dist. LEXIS 74840, case no. 3:21-cv-22 (W.D.PA, 2022). The lack of training, emboldened by qualified immunity, allows the medical staff to unethically practice medicine that is outside the scope of their clinical expertise. Furthermore, their "knowledge of the need for medical care...[and] intentional refusal to provide care" have caused hundreds of inmates to suffer unnecessarily. Westlake v. Lucas, 537 F.2d 857, 860 (6th Cir., 1985); Farmer v. Brennan, 511 US 825; Estelle v. Gamble, 429 US 97; Helling v. McKinney, 509 US 25, 113 S.Ct 2475 (1993); Wilson v. Seiter, 501 US 294, 111 S.Ct 2321 (1991).

ii. Defendant's Health Issues

COVID and its variants continue to cause misery for FCI Loretto inmates, while the government's lack of interest grows. However, a new study shows COVID is much more deadly to men than women, this according to a Wall Street Journal article. "Men died of complications from COVID-19 at a higher rate than women in both rural and urban parts of the U.S. during the first year of the pandemic according to a new report. Data revealed death rates were at least 50% higher for males than females." (https://wallstreetjournal-ny.newsmemory.com/?publink=36430dff6_1348685)

The Defendant has a latent tuberculosis which can become an active disease, not only spreading TB but other viruses that could result in respiratory failure (RSV, Influenza, and COVID-19 – the 2022 Winter Trifecta). On the outside the risk is high but chances of treatment are good. At FCI Loretto the chance of the Defendant receiving antivirals, immunoglobins, or other relevant treatment for COVID-19 is next to zero. Every infection in 2020, 2021, 2022 where more than 80% of the inmate population was infected was "asymptomatic" according to the medical staff. Of course this is a statistical impossibility. Staff provided no COVID-19 treatment to anyone other than to lock the infected individual up in the SHU and call it "medical isaolation." If the Defendant were to contract COVID (or the trifecta) it would be a disaster. His TB would be activated posing a significant risk to staff and inmates.

iii. Mother's Health Issues

Glib's mother has Stage T3 NoM. adenocarcinoma of the sigmoid colon that was initially treated in Ukraine's Regional Medical Center in 2019. She

underwent laproscopic resection of sigmoid colon. She then went under chemotherapy. She had a relapse and developed new tumors in 2020 and she was hospitalized for 4 months and underwent further treatment. Since the war in Ukraine began in February 2022 Valentyna (Glib's mother) has been unable to get cancer treatment. She has been getting worse over the last 6 months. Colorectal cancer is the 3rd most common malignant cancer in the United States and one with high mortality worldwide, including Ukraine. Because of the war with Russia medical treatements are prioritized for the soldiers and those afflicted with war related causalities.

## E. Conclusion

The Defendant is a 29-year old from the Ukraine who was extradited to the US from Poland. He has no criminal history, no history of violence, and he is considered a low risk of recidivism by the BOP. (See Exhibit  ). His legal issues came to the surface before Russia invaded his country, and it is a real stressor for him. He has friends and family who are fighting to survive every day. On top of that, his mother has cancer (see Exhibit M), and given the shortages of trained medical personnel, medicine, and hospital space, her chances of survival are not good. All of this weighs on him.

The Defendant knows he made a mistake, and being sent to prison was his punishment—but he feels the punishment has now become daily, and is out of proportion to the crime. He asks the Court to grant him a compassionate release, turn him over to ICE, and allow him to go home and defend his country, & help his mother and family. He has the support of his family and church in Ukraine, and he'll be able to do something useful. Therefore, he asks

the Court to GRANT him a compassionate release/reduction in sentence and allow him to return to his family and his country, who need him dearly.

November 17, 2022

Submitted by:

Glib Ivanov-Tolpintsev
Pro se, in forma pauperis