A-1 APPENDIX A-1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---X

IN RE:
CORONAVIRUS/COVID-19 PANDEMIC

ADMINISTRATIVE ORDER
NO. 2020-14

STATUS OF DETENTION FACILITIES
HOUSING DEFENDANTS IN CASES FILED IN
THE EASTERN DISTRICT OF NEW YORK

---X

ROSLYNN R. MAUSKOPF, Chief Judge

In response to the coronavirus/COVID-19 pandemic, counsel for defendants detained at three facilities have filed and continue to file applications for release in individual cases pending in this District. A primary basis cited in each of these applications is the general risk of contracting COVID-19 as a result of the defendant's continued confinement, together with additional information specific to the particular defendant and case. Defendants in cases pending in this District are primarily detained at the Metropolitan Detention Center Brooklyn (MDC Brooklyn) and the Metropolitan Correctional Center New York (MCC New York), both operated by the Federal Bureau of Prisons (BOP), and the Queens Detention Facility (QDF), a private facility operated by the GEO Group, Inc. under contract with the United States Marshals Service (USMS) to house primarily pre-trial detainees.

In order to provide the Judges of this Court and the parties in these cases with current, consistent, and accurate information to assess the common issue underlying these applications, it is hereby

ORDERED, that the Wardens of MDC Brooklyn, MCC New York, and QDF provide to this Court in writing, twice weekly on the schedule below, a status report concerning the incidence of infection of COVID-19 at each facility and the measures undertaken to mitigate the spread of COVID-19 within each facility, to include, but not limited to, the following information:

1) Protocols for screening and testing inmates, staff, and other entering or leaving each facility;
2) The number of inmates tested and the number of positive tests;
3) The number of staff and/or others testing positive;
4) All efforts undertaken to mitigate the spread of COVID-19 both generally, and in response to any symptomatic inmate(s) and/or positive test(s); and it is

FURTHER ORDERED, that the first such status report shall be submitted electronically to the undersigned on behalf of the Court by 12:00 noon on Friday, April 3, 2020; and it is

APPENDIX A-2

FURTHER ORDERED, that in light of the nature of the COVID-19 virus and the potential for changed circumstances within each facility, that regular updated status reports shall be so submitted twice weekly, by 4:00 pm on Tuesday and Thursday of each week, commencing Tuesday, April 7, 2020, and, if necessary, in response to any further Order of this Court; and it is

FURTHER ORDERED, that each status report shall also be provided by the BOP to the Executive Director of Federal Defenders of New York for dissemination as appropriate to counsel for defendants detained in these facilities, and to the United States Attorneys for the Eastern and Southern Districts of New York and the United States Marshals for the Eastern and Southern Districts of New York; and it is

FURTHER ORDERED, that given the public interest in all criminal proceedings filed in this District, and in the issue of the potential spread of COVID-19 in the community, each status report will be posted at a link on the public website of this Court.

Nothing in this Order shall prevent any individual Judge or party from seeking additional information relevant to any application filed in this Court.

This Administrative Order shall remain in effect until further Order of the undersigned.

SO ORDERED:

/S

ROSLYNN R. MAUSKOPF
Chief Judge

Dated: Brooklyn, New York
April 2, 2020

APPENDIX C-1

Based on the following facts the actions taken at FCI Loretto stand in violation of Bureau of Prisons Policy (Program Statement 1060.11 (Rated Capacities of Bureau Facilities)), United States Statute (Title 18 U.S.C. §4042(a)(2) (Duties of Bureau of Prisons)), and the U.S. Constitution's 8th Amendment (Prohibition of Cruel and Unusual Punishment).

Specifically, in the past some of the rooms in North and Northeast Units were modified to accomodate for population increase (overcrowding) throughout the BOP. For instance, extra bunks and lockers were added to rooms rated for double occupancy to hold four inmates, and other rooms' walls were partially demolished to combine double occupancy rooms/cells to accomodate six inmates. The defendant lives in the North Unit facility, and space there does not legally accommodate the number of inmates contained therein. For instance, North Unit contains approximately six four-man rooms, about twelve six-man rooms, and one eight-man room. As per the aforementioned policy (which references American Correctional Association Standards), inmates are to be afforded 25 square feet of "Unencumbered Space" when the number of occupants is between 2-50. Unencumbered space is usable space that is not encumbered by furnishings or fixtures in operational posting (bed, sink, desk, and lockers per person). The 4-man rooms (according to policy) are only for double (2 inmates) occupancy, and the six-man rooms are only for triple occupancy. The amount of usable space in the six-man rooms is approximately 122 square feet. If each inmate is to be afforded 25 square feet of unencumbered space (which totals 150 $ft^2$ for six inmates), then it is clear that there is not enough space in these rooms/cells to hold this many inmates. This is a clear

violation of BOP policy and the law.

The shower and toilet facilities pose serious problems as well. For example, North 2 and Northeast (which are adjacent to one another) contain only 13 showers and 10 toilets. ACA standards provide for a ration of 1 toilet for every 12 male inmates and 1 shower for every 8 inmates. At present North 2 and Northeast hold approximately 200 inmates. This means there are approximately 20 inmates per toilet and 15 inmates per shower, which is at least double the number required under ACA standards. The same conditions exist throughout North Unit regarding space and facilities. Furthermore, Central Unit is equipped with modern "central air conditioning and heating". This affords for adequate and proper ventilation for inmates and staff alike. However, North Unit contains only windows in the majority of rooms (4 and 6-man). There is no ventilation system in these rooms to provide forced air movement. During the summer, open windows provide ambient air. This means open windows on a breezy day provide the only source of air in the 4 and 6-man rooms/cells. The ventilation in the rooms is wholly inadequate. The insufficient ventilation systems not only significantly increase the risk of transmission of airborne diseases, but also results in excessive odors, heat, and humidity when combined with a lack of window shades or any method to exclude solar radiation on hot days when combined with overcrowding, permitting unbearable temperature levels. Moreover, TV and TRULINCS computer rooms are not equipped for overcrowding (50-inmate capacity per TV room/approx. 5-8 computers per unit).

APPENDIX E-1

§1B1.13. Reduction in Term of Imprisonment Under 18 U.S.C. § 3582(c)(1)(A) (Policy Statement)

Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—

(1) (A) extraordinary and compelling reasons warrant the reduction; or

(B) the defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;

(2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and

(3) the reduction is consistent with this policy statement.

Commentary

Application Notes:

1. Extraordinary and Compelling Reasons.—Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set forth below:

(A) Medical Condition of the Defendant.—

(i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

§1B1.13

(ii) The defendant is—

(I) suffering from a serious physical or medical condition,

(II) suffering from a serious functional or cognitive impairment, or

(III) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C) Family Circumstances.—

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

(i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.

(ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D) Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

2. Foreseeability of Extraordinary and Compelling Reasons.—For purposes of this policy statement, an extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment. Therefore, the fact that an extraordinary and compelling reason reasonably could have been known or anticipated by the sentencing court does not preclude consideration for a reduction under this policy statement.

3. Rehabilitation of the Defendant.—Pursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement.

4. Motion by the Director of the Bureau of Prisons.—A reduction under this policy statement may be granted only upon motion by the Director of the Bureau of Prisons pursuant to 18 U.S.C. § 3582(c)(1)(A). The Commission encourages the Director of the Bureau of Prisons to file such a motion if the defendant meets any of the circumstances set forth in Application Note 1. The court is in a unique position to determine whether the circumstances warrant a reduction (and, if so, the amount of reduction), after considering the factors set forth in 18 U.S.C. § 3553(a) and the criteria set forth in this policy statement, such as the defendant's medical condition, the defendant's family circumstances, and whether

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

the defendant is a danger to the safety of any other person or to the community.

This policy statement shall not be construed to confer upon the defendant any right not otherwise recognized in law.

5. Application of Subdivision (3).—Any reduction made pursuant to a motion by the Director of the Bureau of Prisons for the reasons set forth in subdivisions (1) and (2) is consistent with this policy statement.

Background: The Commission is required by 28 U.S.C. § 994(a)(2) to develop general policy statements regarding application of the guidelines or other aspects of sentencing that in the view of the Commission would further the purposes of sentencing (18 U.S.C. § 3553(a)(2)), including, among other things, the appropriate use of the sentence modification provisions set forth in 18 U.S.C. § 3582(c). In doing so, the Commission is authorized by 28 U.S.C. § 994(t) to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." This policy statement implements 28 U.S.C. § 994(a)(2) and (t).

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Exhibit 1

APPENDIX E-1

§1B1.13. Reduction in Term of Imprisonment Under 18 U.S.C. § 3582(c)(1)(A) (Policy Statement)

Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—

(1) (A) extraordinary and compelling reasons warrant the reduction; or

(B) the defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;

(2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and

(3) the reduction is consistent with this policy statement.

Commentary

Application Notes:

1. Extraordinary and Compelling Reasons.—Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set forth below:

(A) Medical Condition of the Defendant.—

(i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Exhibit 1

life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

<u>§1B1.13</u>

(ii) The defendant is—

(I) suffering from a serious physical or medical condition,

(II) suffering from a serious functional or cognitive impairment, or

(III) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C) Family Circumstances.—

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

APPENDIX E-3

(i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.

(ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D) Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

2. Foreseeability of Extraordinary and Compelling Reasons.—For purposes of this policy statement, an extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment. Therefore, the fact that an extraordinary and compelling reason reasonably could have been known or anticipated by the sentencing court does not preclude consideration for a reduction under this policy statement.

3. Rehabilitation of the Defendant.—Pursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement.

4. Motion by the Director of the Bureau of Prisons.—A reduction under this policy statement may be granted only upon motion by the Director of the Bureau of Prisons pursuant to 18 U.S.C. § 3582(c)(1)(A). The Commission encourages the Director of the Bureau of Prisons to file such a motion if the defendant meets any of the circumstances set forth in Application Note 1. The court is in a unique position to determine whether the circumstances warrant a reduction (and, if so, the amount of reduction), after considering the factors set forth in 18 U.S.C. § 3553(a) and the criteria set forth in this policy statement, such as the defendant's medical condition, the defendant's family circumstances, and whether

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

# You Had Covid. How Long Are You Protected?

YOUR HEALTH SUMATHI REDDY

**IF YOU HAVE HAD** Covid-19, how long can you expect to be protected from another infection?

Doctors say the window between infections might be shrinking, fueled in part by the immune-evading Omicron BA.5 subvariant, although researchers are still gathering data.

The U.S. Centers for Disease Control and Prevention has long set 90 days as its window for what counts as a new Covid-19 infection—meaning that symptoms or positive Covid tests within 90 days of a prior infection have been considered the same infection. Getting reinfected sooner has always been possible but uncommon.

Now, reinfections are happening more often and can occur closer in time, say infectious-disease specialists and epidemiologists. They cite the march of new subvariants emerging and circulating simultaneously as well as BA.5's ability to evade immune protections. In addition, doctors note, people are taking fewer precautions, such as masking indoors or avoiding large gatherings.

"This new variant's superpower is reinfection," says Peter Chin-Hong, a University of California, San Francisco infectious-disease specialist and professor of medicine. The 90-day rule of thumb now is "completely out the window," he says.

You are still unlikely to get reinfected with the same subvariant within a few weeks or months, doctors say. So if you just had BA.5, you probably won't get it again this summer, they say.

The rapid rise of new variants and subvariants presents challenges. Most people won't know for sure which subvariant they had, and many have been circulating in recent months. If you had a BA.2 infection a month ago, you might still be vulnerable to BA.5, scientists say, because the latter is better at evading immunity from vaccines or prior infections.

BA.5 is still new, and scientists lack definitive research about its reinfection rates, although medical experts around the world are revisiting earlier assumptions about reinfection windows.

Australian health officials recently changed their definition of what counts as a Covid reinfection to a new infection occurring at least 28 days after recovery from the last one, down from 12 weeks.

The rapid rise of Covid-19 variants and subvariants is presenting serious challenges.

GETTY IMAGES (2)

The CDC still defines a Covid reinfection as a new Covid infection occurring at least 90 days after a previous one, a definition that some doctors say is outdated. When the rule of thumb was first established, most people were getting diagnosed using PCR tests, which can detect dead virus and keep yielding positive results even when people are no longer infectious. The CDC didn't respond to requests for comment.

The 90-day rule took hold early in the pandemic when more people were taking precautions, such as social distancing, masking and avoiding travel, says John Wherry, director of the Institute for Immunology at the University of Pennsylvania. Now, many people who recover from Covid-19 resume normal life without taking preventive measures and get exposed again.

For people who were recently infected with a different Omicron subvariant, a new infection with BA.5 could happen in as little as four to eight weeks, UCSF's Dr. Chin-Hong estimates, mainly because it can better evade immune defenses.

A Covid-19 infection is no longer a "get out of having Covid" card for the next three months. "I don't think anyone should think they're invincible," Dr. Wherry says.

Even before BA.5 spread, research showed that reinfections within 90 days were possible, though uncommon.

Danish researchers found in a March preprint, which hasn't been peer-reviewed, that though reinfections were rare, a number of them occurred within 60 days. Other preliminary studies, including one from the CDC, made similar findings.

A person's vulnerability to reinfection increases over time, notes David Dowdy, an epidemiologist at Johns Hopkins Bloomberg School of Public Health in Baltimore.

"It's not that after 90 days suddenly you become fully susceptible" to infection, he says. "It's really that at 60 days you are somewhat susceptible and at 90 days you're more susceptible and by 120 days you're even more susceptible."

An infection now with BA.5 will likely protect someone from reinfection by the same subvariant for perhaps roughly three or four months, he estimates, because that is the variant the body's defenses will recognize best.

Some medical experts like Daniel Kuritzkes, chief of the division of infectious diseases at Brigham and Women's Hospital in Boston, say the 90-day rule for reinfections is still reasonable. Some people will get reinfected sooner than two months, but he says most reinfections will happen after a longer window.

The two key factors, he says, are how a new variant differs from the one that infected a person previously and how persistent the person's immune response has been after the most-recent infection.

He says a reinfection within two months is unlikely, but the outlook becomes fuzzier between two and three months. And as new variants emerge, the windows will continue to change.

"This is going to be a constantly changing parameter," he says.

Exhibit. Alpha



26. F. A. M. de Faria, P. Jaramillo, H. O. Sawakuchi, J. C. Richey, N. Barros, Environ. Res. Lett. 10, 124019 (2015).
27. J. M. Gomes-Selman et al., Lect. Notes Comput. Sci. 10848, 263–279 (2018).
28. Q. Shi et al., "Efficiently optimizing for dendritic connectivity on tree-structured networks in a multi-objective framework," Proceedings of the 1st ACM SIGCAS Conference on Computing and Sustainable Societies, article 26 (2018).
29. X. Wu et al., Proc. Conf. AAAI Artif. Intell. 32, 849–858 (2018).
30. Amazon EcoVistas: Visualization of the Ecosystem Services Pareto Frontier for Proposed Amazon Hydropower Development; https://www.cs.cornell.edu/gomes/udiscoverit/amazon-ecovistas/.
31. T. B. A. Couto, M. L. Messager, J. D. Olden, Nat. Sustain. 4, 409–416 (2021).
32. R. J. P. Schmitt, S. Bizzi, A. Castelletti, G. M. Kondolf, Nat. Sustain. 1, 96–104 (2018).
33. R. J. P. Schmitt, S. Bizzi, A. Castelletti, J. J. Opperman, G. M. Kondolf, Sci. Adv. 5, eaaw2175 (2019).
34. C. Zir, E. Baran, S. Nam, I. Rodriguez-Iturbe, S. A. Levin, Proc. Natl. Acad. Sci. U.S.A. 109, 5609–5614 (2012).
35. J. A. Constantine, T. Dunne, J. Ahmed, C. Legleiter, E. D. Lazarus, Nat. Geosci. 7, 899–903 (2014).
36. C. M. Latrubesse et al., Aquat. Conserv. 31, 1136–1149 (2021).
37. S. Athayde et al., Curr. Opin. Environ. Sustain. 37, 50–69 (2019).
38. J. Opperman et al., "The power of rivers—A business case: How system-scale planning and management of hydropower can yield economic, financial and environmental benefits" (The Nature Conservancy, 2017).
39. H. L. Poll et al., Nat. Clim. Chang. 6, 25–34 (2016).
40. K. Bock, R. Poll, L. Schilling, in Riverine Ecosystem Management: Science for Governing Towards a Sustainable Future, S. Schmutz, J. Sendzimir, Eds. (Aquatic Ecology Series, Springer International Publishing, Cham, 2018), pp. 413–433.
41. S. R. Carpenter et al., Proc. Natl. Acad. Sci. U.S.A. 106, 1305–1312 (2009).
42. R. M. Almeida et al., Glob. Environ. Change 71, 102383 (2021).
43. M. C. Arias et al., Nat. Sustain. 3, 430–436 (2020).
44. F. A. M. de Faria, P. Jaramillo, Energy Sustain. Dev. 41, 24–35 (2017).
45. R. J. P. Schmitt, N. Kittner, G. M. Kondolf, D. M. Kammen, Environ. Res. Lett. 16, 054054 (2021).
46. K. Sials, A. K. Chowdhury, T. D. Dang, S. Galelli, Nat. Commun. 12, 4159 (2021).
47. T. B. Wild, P. M. Reed, D. P. Loucks, M. Mallen-Cooper, E. D. Jensen, J. Water Resour. Plan. Manage. 145, 05018019 (2019).
48. M. A. Tigre, Regional Cooperation in Amazonia: A Comparative Environmental Law Analysis (Brill Nijhoff, 2017).
49. F. R. Pinl et al., Science 366, 699–700 (2019).
50. Amazon Regional Observatory, https://oraotca.org/en/.

#### ACKNOWLEDGMENTS

This work was carried out by our Amazon Dams Computational Sustainability Working Group based at Cornell University. The contribution of X.W. was completed while at Cornell University. We thank the Cornell Atkinson Center for Sustainability; the Universidad de Ingeniería y Tecnología (UTEC) in Lima, Peru; and Florida International University for hosting working group meetings to develop the project framework. The Amazon Fish Project (www.amazon-fish.com/) provided data for fish diversity threat analyses. We acknowledge the inspirational ideas of our late colleagues Greg Poe and Javier Maldonado-Ocampo, who were instrumental in the conceptualization of this work. Funding: This work was funded by an NSF Expeditions in Computing award (CCF-1522054) to C.P.G. and a Cornell University Atkinson Academic Venture Fund award to A.S.Flec., C.P.G., and S.S. Computations were performed using the AI for Discovery Avatar (AIDA) computer cluster funded by an Army Research Office (ARO) Defense University Research Instrumentation Program (DURIP) award (W911NF-17-1-0187) to C.P.G. Author contributions: Conceptualization: All authors contributed to conceptualization through active participation in working group meetings. R.G.-V., Q.S., R.M.A., B.R.F., E.P.A., and A.S.Flec. compiled and curated the hydropower dam dataset. Hydrological and sediment flux analyses were developed by H.A., A.S.Fial., R.F., B.R.F., Q.S., S.S., N.L.P., S.A.T., S.K.H., R.M.A., R.G.-V., J.D.A., L.C.B., X.Z.-R., S.T., and U.T.W. and were conducted by H.A., Q.S., and A.S.Fial. Dendritic connectivity was analyzed by Q.S. and R.G.-V., with assistance from S.A.S., E.P.A., C.M.C., and M.G. Fish diversity threat analyses were conducted by Q.S., E.I.L., and C.J., with assistance from E.P.A., C.M.C., A.C.E., J.H., M.G., O.D., M.I.L., and M.V., using Amazon fish data provided by T.O. Greenhouse gas emissions were analyzed by R.M.A., S.A.S., and R.B., with input from B.R.F., S.K.H., and J.M.M. Computational analyses were developed and performed by C.P.G., J.M.G.-S., Q.S., X.W., Y.X., and G.P. The interactive visual supplement [Amazon EcoVistas (30)] was developed by R.B. and B.H.R., with input from C.P.G., Q.S., R.M.A., and S.A.H. Visualizations were made by Q.S., R.M.A., R.B., and B.H.R., with substantial contributions from S.A.T. and S.A.H. Funding for our Amazon Dams Computational Sustainability Working Group was acquired by C.P.G. and A.S.Flec. The manuscript was drafted by A.S.F., R.M.A., S.A.H., B.R.F., Q.S., and C.P.G. in close collaboration with S.A.S., S.A.T., N.L.P., S.K.H., J.H., P.B.M., M.G., J.M.M., and A.S.Fial. All authors reviewed the manuscript. Competing interests: The authors declare that they have no competing interests. Data and materials availability: The Pareto optimization code is available on eCommons and can be downloaded from the following persistent URL: https://doi.org/10.7298/qh5e-6122. The Amazon EcoVistas tutorial and visualization of the Pareto frontier are available at www.cs.cornell.edu/gomes/udiscoverit/amazon-ecovistas/. All data needed to evaluate the conclusions in the paper are present in the paper and the supplementary materials. For convenience, the data, code, GitHub, and tutorial can also be accessed through a single webpage: www.cs.cornell.edu/gomes/udiscoverit/?tag=hydro.

#### SUPPLEMENTARY MATERIALS

science.org/doi/10.1126/science.abj4017
Materials and Methods
Figs. S1 to S6
Tables S1 to S3
References (51–98)
MDAR Reproducibility Checklist
Data S1 and S2

11 May 2021; accepted 16 December 2021
10.1126/science.abj4017

## REPORTS

CORONAVIRUS

# SARS-CoV-2 Omicron variant: Antibody evasion and cryo-EM structure of spike protein–ACE2 complex

Dhiraj Mannar[1]†, James W. Saville[1]†, Xing Zhu[1]†, Shanti S. Srivastava[1], Alison M. Berezuk[1], Katharine S. Tuttle[1], Ana Citlali Marquez[2], Inna Sekirov[2,3], Sriram Subramaniam[1,4]*

The newly reported Omicron variant is poised to replace Delta as the most prevalent severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) variant across the world. Cryo–electron microscopy (cryo-EM) structural analysis of the Omicron variant spike protein in complex with human angiotensin-converting enzyme 2 (ACE2) reveals new salt bridges and hydrogen bonds formed by mutated residues arginine-493, serine-496, and arginine-498 in the receptor binding domain with ACE2. These interactions appear to compensate for other Omicron mutations such as the substitution of asparagine for lysine at position 417 (K417N) that are known to reduce ACE2 binding affinity, resulting in similar biochemical ACE2 binding affinities for the Delta and Omicron variants. Neutralization assays show that pseudoviruses that display the Omicron spike protein exhibit increased antibody evasion. The increase in antibody evasion and the retention of strong interactions at the ACE2 interface thus represent important molecular features that likely contribute to the rapid spread of the Omicron variant.

The Omicron (B.1.1.529) variant of severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2), first reported in November 2021, was quickly identified as a variant of concern with the potential to spread rapidly across the world. This concern is heightened because the Omicron variant is now circulating even among doubly vaccinated individuals. SARS-CoV-2 relies on a trimeric spike protein for host cell entry via recognition of the angiotensin-converting enzyme 2 (ACE2) receptor. The Omicron variant spike protein has 37 mutations, as compared to 12 mutations in the Gamma variant spike protein, which was previously the variant with the greatest number of spike protein mutations (1). Understanding the consequences of these mutations for ACE2 receptor binding and neutralizing antibody evasion is important in guiding the development of effective therapeutics to limit the spread of the Omicron variant and related variants.

The spike protein comprises two domains: the S1 domain, which contains the receptor binding domain (RBD), and the S2 domain, which is responsible for membrane fusion. The Omicron variant has 37 mutations (Fig. 1A) in the spike protein relative to the initial Wuhan-Hu-1 strain, with 15 of them present in the RBD

[1]Department of Biochemistry and Molecular Biology, University of British Columbia, Vancouver, BC, Canada. [2]BC Center for Disease Control Public Health Laboratory, Vancouver, BC, Canada. [3]Department of Pathology and Laboratory Medicine, University of British Columbia, Vancouver, BC, Canada. [4]Gandeeva Therapeutics, Inc., Vancouver, BC, Canada.
*Corresponding author. Email: sriram.subramaniam@ubc.ca
†These authors contributed equally to this work.

Fig. 1. Cryo-EM structure of the Omicron spike protein. (A) A schematic diagram illustrating the domain arrangement of the spike protein. Mutations present in the Omicron variant spike protein are labeled. RBM, receptor binding motif. (B) Cryo-EM map of the Omicron spike protein at 2.79-Å resolution. Protomers are colored in different shades of purple. (C) Cryo-EM structure of Omicron spike protein indicating the locations of modeled mutations on one protomer. (D) The Omicron spike protein RBD shown in two orthogonal orientations with Cα positions of the mutated residues shown as red spheres. Single-letter abbreviations for the amino acid residues are as follows: A, Ala; C, Cys; D, Asp; E, Glu; F, Phe; G, Gly; H, His; I, Ile; K, Lys; L, Leu; M, Met; N, Asn; P, Pro; Q, Gln; R, Arg; S, Ser; T, Thr; V, Val; W, Trp; and Y, Tyr.

Fig. 2. SPR analysis of the wild-type, Delta, and Omicron spike protein affinities for human ACE2. (A to C) Representative traces of single-cycle kinetic analyses of spike protein–ACE2 binding. The raw data (black) is fit (red) to a model using a 1:1 binding stoichiometry from which apparent dissociation constants were derived. The curves were obtained by injecting 6.25, 31.25, 62.5, 125, and 250 nM of each spike protein in successive cycles. RU, response units; WT, wild type. (D) Quantitation of apparent dissociation constants ($K_{D,app}$) for the wild-type, Delta, and Omicron spike protein–ACE2 interactions. The standard deviation obtained from at least three technical replicates is shown. Horizontal dotted lines are plotted for mutants carrying only K417N (top) or N501Y and E484K ($Glu^{484}$→Lys; bottom) mutations to demonstrate the range of this assay (see fig. S2 for binding data). A Tukey's multiple comparisons test was performed on the wild-type, Delta, and Omicron binding affinities (*$P \le 0.05$; ns, not significant). A table highlighting the fold changes in $K_{D,app}$ for the Delta and Omicron spike protein–ACE2 interactions relative to wild type is shown.

(1). The RBD mediates attachment to human cells through the ACE2 receptor and is the primary target of neutralizing antibodies (2, 3). The Delta variant, which was the predominant SARS-CoV-2 lineage until the emergence of Omicron, has seven mutations in the spike protein relative to the Wuhan-Hu-1 strain, with two mutations falling within its RBD. Of the Delta spike protein mutations, two [T478K ($Thr^{478}$→Lys) in the RBD and D614G ($Asp^{614}$→Gly) at the C terminus of S1] are shared with the Omicron strain. Analysis of the sequence of the Omicron genome suggests that it is not derived from any of the variants circulating at present and may have a different origin (4).

Cryo–electron microscopy (cryo-EM) structural analysis of the Omicron spike protein ectodomain shows that the overall organization of the trimer is similar to that observed for the ancestral strain (5–7) and all earlier variants (8–10) (Fig. 1B and table S1). The RBD in one of the protomers (protomer 1) is well-resolved and is in the "down" position, whereas the other two RBDs are less well-resolved because they are flexible relative to the rest of the spike protein polypeptide. Similarly, the amino terminal domain (NTD) is poorly resolved, reflecting the dynamic and flexible nature of this domain. The mutations in the Omicron variant spike protein are distributed both on the surface and the interior of the spike protein (Fig. 1C), including the NTD and RBD regions. The mutations in the RBD are predominantly distributed on one face of the domain (Fig. 1D), which spans regions that bind ACE2 as well as those that form epitopes for numerous neutralizing antibodies (11).

The Omicron variant shares RBD mutations with previous variants of concern [K417N ($Lys^{417}$→Asn), T478K, and N501Y ($Asn^{501}$→Tyr)]. The N501Y and K417N mutations impart increased and decreased ACE2 binding affinities, respectively (8, 12–16). These mutational effects preserve the same general impact on ACE2 affinity when present in isolation or in combination with other RBD mutations (12). However, the Omicron RBD contains additional mutations, most of which have been shown to decrease receptor binding in a high-throughput assay (table S2) (17), with the exception of G339D ($Gly^{339}$→Asp), N440K ($Asn^{440}$→Lys), S447N ($Ser^{447}$→Asn), and Q498R ($Gln^{498}$→Arg) (17, 18). To measure the impact of Omicron spike protein mutations on human ACE2 binding affinity, we performed surface plasmon resonance (SPR) studies and compared the resulting apparent binding affinities ($K_{D,app}$) to wild-type and Delta spike proteins (Fig. 2). "Wild type" is used in this work to refer to the ancestral Wuhan-Hu-1 strain with the addition of the D614G mutation. Although the Omicron spike protein exhibits a measurable increase in apparent affinity for ACE2 relative to the wild-type spike protein [in agreement with a recent preprint (19)], the apparent ACE2 affinity is similar for both the Delta and Omicron variants (Fig. 2D). Despite harboring several RBD mutations that decrease ACE2 binding (fig. S2) (12, 16, 17), the preservation of overall ACE2 binding affinity for the Omicron spike protein suggests there are compensatory mutations that restore higher affinity for ACE2. Such mutational effects should be possible to visualize

Fig. 3. Cryo-EM structure of the Omicron spike protein–ACE2 complex. (A) Cryo-EM map of the Omicron spike protein in complex with human ACE2 at 2.45-Å resolution after global refinement. The three protomers are colored in different shades of purple, and the density for bound ACE2 is colored in blue. (B) Cryo-EM map of the Omicron spike protein RBD in complex with ACE2 at 2.66-Å resolution after focused refinement. The boxed area indicates the region highlighted in (C). (C) Cryo-EM density mesh at the Omicron spike protein RBD-ACE2 interface, with fitted atomic model. Yellow and red dashed lines represent new hydrogen bonds and ionic interactions, respectively. (D to F) Comparison of the RBD-ACE2 interface between the Omicron (top) and Delta (bottom) variants. Compared with the Delta variant, new interactions are formed as a result of the mutations Q493R, G496S, and Q498R (D) and local structural changes owing to the N501Y and Y505H ($Tyr^{505}$→His) mutations (E) present in the Omicron variant. The salt bridge between Delta RBD K417 and ACE2 D30 that is present in the Delta variant spike protein but lost in the Omicron variant is highlighted in (F). Yellow and red dashed lines represent hydrogen bonds and ionic interactions, respectively.

in global prevalence, and to wild-type SARS-CoV-2, given that most SARS-CoV-2 vaccine immunogens at this time are based on this sequence (21).

We used a panel of neutralizing monoclonal antibodies that include four RBD-directed antibodies [ab1, ab8, S309, and S2M11; (22–25)] and two NTD-directed antibodies [4-8 and 4A8; (26, 27)] to investigate the impact of Omicron RBD and NTD mutations on monoclonal antibody escape. In contrast to wild-type SARS-CoV-2 and the Alpha (B.1.1.7), Gamma (P.1), Kappa (B.1.617.1), and Delta (B.1.617.2) variants, the Omicron variant could not be completely neutralized at maximum concentrations of five of the six antibodies tested (Fig. 4A and fig. S4) (20, 28). The loss of neutralizing activity for both the NTD-directed antibodies (4-8 and 4A8) against Omicron is likely due to the Δ144-145 deletion, which falls within the footprint of both of these antibodies (Fig. 4B). The escape from RBD-directed antibodies S2M11, ab8, and ab1 is likely due to the numerous Omicron mutations that lie within their respective footprints (Fig. 4B). By contrast, S309 (an antibody undergoing evaluation in clinical trials for treating patients with COVID-19) was able to fully neutralize the Omicron variant, consistent with previous reports that show retained neutralization capacity of S309 despite a mild decrease in potency (19, 29–31). The unusually high number of mutations in the Omicron variant spike protein thus appear to confer broad antibody escape relative to previously emerged variants of SARS-CoV-2, consistent with emerging reports (19).

Sera obtained from patients not exposed to SARS-CoV-2 (prepandemic) showed negligible neutralization activity against wild-type SARS-CoV-2 and both the Delta and Omicron variants (fig. S5). Sera from either vaccinated or convalescent patients exhibited potent neutralization of wild-type pseudoviruses (figs. S6 to S9); sera from convalescent patients displayed, on average, a 6.3× decrease in ability to neutralize the Omicron variant relative to wild type (Fig. 4C, top). Sera from the vaccinated cohort also displayed reduced neutralization ability (4.4× decrease on average) with a wider variation driven by some individuals that showed greater loss of neutralization ability against Omicron. The comparison of change in neutralization potential between the Delta and Omicron variants is perhaps more relevant given the previous worldwide dominance of the Delta variant. Sera from convalescent patients shows an even greater drop in neutralization potency relative to the Delta variant (8.2× decrease), whereas the vaccinated group also shows reduction in potency, although to a lesser extent (3.4× decrease) (Fig. 4C, bottom).

A finer analysis of the unvaccinated convalescent cohort stratified into those who recovered from infection with either the Delta, Alpha, or Gamma variants (Fig. 4D) highlights the reduction in neutralization potency against the Omicron variant relative to the Delta variant in all populations, with especially notable drops for patients who recovered from infection with the earlier Alpha and Delta variants. The findings we report here are consistent with several other recent reports (19, 32–34) that support the finding that the Omicron variant is more resistant to neutralization dependent on prior infection with an earlier variant or vaccination than any other variant of concern that has emerged over the course of the COVID-19 pandemic.

The large number of mutations on the surface of the spike protein, including the immunodominant RBD (Fig. 1), would be expected to help the virus escape antibodies elicited by vaccination or prior infection. It is interesting that the Omicron variant evolved to retain its ability to bind ACE2 efficiently despite these extensive mutations. The cryo-EM structure of the spike protein–ACE2 complex provides a structural rationale for how this is achieved: Interactions involving the new mutations in the Omicron variant at residues 493, 496, 498, and 501 appear to restore ACE2 binding efficiency that would be lost as a result of other mutations such as K417N. The Omicron variant thus appears to have evolved to selectively balance an increase in escape from neutralization with its ability to interact efficiently with ACE2. The increase in antibody evasion and the retention of strong interactions at the ACE2 interface are thus factors that likely contribute to the increase in transmissibility of the Omicron variant.

#### REFERENCES AND NOTES

1. S. Elbe, G. Buckland-Merrett, Glob. Chall. 1, 33–46 (2017).
2. M. Hoffmann et al., Cell 181, 271–280.e8 (2020).
3. L. Piccoli et al., Cell 183, 1024–1042.e21 (2020).
4. C. Wei et al., J. Genet. Genomics 10.1016/j.jgg.2021.12.003 (2021).
5. A. C. Walls et al., Cell 181, 281–292.e6 (2020).
6. D. Wrapp et al., Science 367, 1260–1263 (2020).
7. J. Zhang et al., Science 372, 525–530 (2021).
8. X. Zhu et al., PLOS Biol. 19, e3001237 (2021).
9. J. Zhang et al., Science 374, 1353–1360 (2021).
10. S. M.-C. Gobeil et al., Science 373, eabi6226 (2021).
11. K. M. Hastie et al., Science 374, 472–478 (2021).
12. D. Mannar et al., Cell Rep. 37, 110156 (2021).
13. M. I. Barton et al., eLife 10, e70658 (2021).
14. H. Liu et al., Cell Res. 31, 720–722 (2021).
15. F. Tian et al., eLife 10, e69091 (2021).
16. C. Laffeber, K. de Koning, R. Kanaar, J. H. G. Lebbink, J. Mol. Biol. 433, 167058 (2021).
17. T. N. Starr et al., Cell 182, 1295–1310.e20 (2020).
18. J. Zahradník et al., Nat. Microbiol. 6, 1188–1198 (2021).
19. E. Cameroni et al., Nature 10.1038/s41586-021-04386-2 (2021).
20. J. W. Saville et al., bioRxiv 2021.2009.2002.458774 [Preprint] (2021); https://doi.org/10.1101/2021.09.02.458774.
21. F. Krammer, Nature 586, 516–527 (2020).
22. W. Li et al., Proc. Natl. Acad. Sci. U.S.A. 117, 29832–29838 (2020).
23. W. Li et al., Cell 183, 429–441.e16 (2020).
24. M. A. Tortorici et al., Science 370, 950–957 (2020).
25. D. Pinto et al., Nature 583, 290–295 (2020).
26. L. Liu et al., Nature 584, 450–456 (2020).
27. X. Chi et al., Science 369, 650–655 (2020).
28. D. Mannar et al., bioRxiv 2021.12.17.473178 [Preprint] (2021); https://doi.org/10.1101/2021.12.17.473178.
29. L. VanBlargan et al., bioRxiv 2021.2012.2015.472828 [Preprint] (2021); https://doi.org/10.1101/2021.12.15.472828.
30. A. Cathcart et al., bioRxiv 2021.03.09.434607 [Preprint] (2021); https://doi.org/10.1101/2021.03.09.434607.
31. M. McCallum et al., bioRxiv 2021.2012.2028.474380 [Preprint] (2021); https://doi.org/10.1101/2021.12.28.474380.
32. D. Planas et al., Nature 10.1038/s41586-021-04389-z (2021).
33. A. Rossler, L. Riepler, D. Bante, D. v. Laer, J. Kimpel, medRxiv 2021.2012.2008.21267491 [Preprint] (2021); https://doi.org/10.1101/2021.12.08.21267491.
34. L. Liu et al., Nature 10.1038/s41586-021-04388-0 (2021).

#### ACKNOWLEDGMENTS

We thank K. Leopold (University of British Columbia) and C. Leung (Gandeeva Therapeutics, Inc.) for assistance with the SPR experiments and for helpful discussions. Funding: This work was supported by awards to S.S. from a Canada Excellence Research Chair Award; the VGH Foundation; Genome BC, Canada; and the Tai Hung Fai Charitable Foundation. D.M. is supported by a CIHR Frederick Banting and Charles Best Canada Graduate Scholarship Master's Award (CGS-M). J.W.S. is supported by a CIHR Frederick Banting and Charles Best Canada Graduate Scholarships Doctoral Award (CGS D) and a University of British Columbia President's Academic Excellence Initiative PhD Award. Author contributions: This work was the result of a concerted team effort from all individuals listed as authors. J.W.S. and D.M. carried out expression and purification of the Omicron spike protein and antibodies. D.M. performed the SPR binding analyses. D.M. and J.W.S. performed the pseudovirus neutralization experiments. I.S. and A.C.M. provided the vaccine-induced patient-derived sera samples and aided the interpretation of the patient data. A.M.B., S.S.S., and K.S.T. carried out experimental aspects of EM, including specimen preparation and data collection. X.Z. carried out computational aspects of image processing and structure determination. X.Z., S.S.S., D.M., J.W.S., and S.S. interpreted and analyzed the cryo-EM structures, binding analyses, and patient neutralization data and composed the manuscript with input from the rest of the authors. S.S. provided overall supervision for the project. Competing interests: All authors except for S.S. declare no competing interests. S.S. is the Founder and CEO of Gandeeva Therapeutics, Inc. Data and materials availability: All newly created materials described in this manuscript will be available from the corresponding author upon reasonable request. Cryo-EM reconstructions and atomic models generated during this study are available at the Protein Data Bank (PDB) and Electron Microscopy Data Bank (EMBD) databases under the following accession codes: unbound Omicron spike protein trimer (PDB ID 7TJ, EMD-25759), global ACE2-bound Omicron spike protein trimer (PDB ID 7T9K, EMD-25760), and focus-refinement of the ACE2-RBD interface for the ACE2-bound Omicron spike protein trimer (PDB ID 7T9L, EMD-25761).

This work is licensed under a Creative Commons Attribution 4.0 International (CC BY 4.0) license, which permits unrestricted use, distribution, and reproduction in any medium, provided the original work is properly cited. To view a copy of this license, visit https://creativecommons.org/licenses/by/4.0/. This license does not apply to figures/photos/artwork or other content included in the article that is credited to a third party; obtain authorization from the rights holder before using such material.

#### SUPPLEMENTARY MATERIALS

science.org/doi/10.1126/science.abn7760
Materials and Methods
Figs. S1 to S9
Tables S1 to S3
References (35–39)
MDAR Reproducibility Checklist

13 December 2021; accepted 18 January 2022
Published online 20 January 2022
10.1126/science.abn7760