UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA          )
      Plaintiff,                  )
                           )
                           )
      v.                          )   Case#: 8:20-cr-309-SDM-AEP
                           )
Glib Oleksandr Ivanov-Tolpintsev  )
      Defendant                   )
                           )
                           )

---

DEFENDANT'S RESPONSE TO THE GOVERNMENT'S
OPPOSITION TO A COMPASSIONATE RELEASE

Now comes the Defendant, Glib Oleksandr Ivanov-Tolpintsev, pro se and in
forma pauperis, with his response to the government's opposition to a com-
passionate release under 18 USC § 3582(c)(1)(A)(i).

December 20, 2022

Submitted by:

x _____
Glib Oleksandr Ivanov-
Tolpintsev

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

   v.

Glib Oleksandr Ivanov-
Tolpintsev
     Defendant

Case # 8:20-cr-309-SDM-AEP

## DEFENDANT'S RESPONSE TO THE GOVERNMENT'S
## OPPOSITION TO A COMPASSIONATE RELEASE

First and foremost the Defendant received the government's response in opposition on December 8 , 2022, opened and by normal prison mail and noted the inclusion of the "United States Motion to Seal" the Defendant's medical records. At no time was the Defendant notified of such a motion and he here and now objects to the sealing of said records. Also, the Defendant has a question for the court: how is it the BOP provided the government with a more complete set of records than that which was given to the Defendant?[1]


The government begins its Memorandum of Law (see 'response', pg.2) with the following paragraph:

> "A court may reduce a term of imprisonment upon finding 'extraordinary and compelling circumstances,' consistent with applicable policy statements of the Sentencing Commission. 18 USC § 3582(c)(1)(A). Section 3582(c)(1)(A), however, does not define what constitutes extraordinary and compelling reasons. Rather, Congress has delegated the authority to 'describe what should be considered extraordinary and compelling reasons for sentence reduction' to the Sentencing Commission. 28 USC § 994(t). Specifically, USSG §1B1.13 contains the Sentencing Commission's policy statement on compassionate release."

There are two problems, better yet errors, contained in this statement, the government's claim there is no definition for extraordinary and compelling,

---

1. Referring to medical records.

1

leaving it up to Congress, and the government's claim that USSG §1B1.13

is the controlling factor when determining what constitutes grounds for a

compassionate release. With respect to the former the Supreme Court's decision

in Setser v. US, 182 L. Ed. 2d 455, 464 (2012) defined extraordinary and com-

pelling as unfairness. It ruled that "when a district court's failure to

anticipate developments that take place after the first sentencing" produces

unfairness to the defendant, the Act provides a mechanism for relief. Section

3582(c)(1)(A) provides that a district court:

> "upon motion of the Director of the BOP, may reduce the term of imprison-
> ment...after considering the factors set forth in Section 3553(a) to
> the extent they are applicable, if it finds that...extraordinary and
> compelling reasons warrant such a reduction [or that the defendant meets
> other criteria for relief]."

Unfairness is the only definition for extraordinary and compelling reasons

the Supreme Court has ever provided. What the Defendant has been and continues

to be subjected to is inherently unfair, and his remedy lies with the Court.


With respect to the latter issues the government's reliance on USSG §1B1.13

is misplaced because it only applies to the BOP and was written when only

the BOP could bring compassionate release motions. The very first words of

the USSG §1B1.13 are "upon the motion of the Director of the BOP," and that

is precisely the requirement the government is trying to impose, and the First

Step Act expressly removed. See US v. Zullo, 976 F.3d 228, 237 (2nd Cir.,

2020); US v. Aruda, 993 F.3d 797, 802 (9th Cir., 2021); US v. Beck, 2019 US

Dist. LEXIS 108542 (M.D. N.C., 2019); Crowe v. US, 430 F. Appx. 484, 485

(6th Cir., 2021).(See Exhibit 2)


The AUSA wants to pretend that because the BOP/FCI Loretto says they provide

competent medical care (see Response, pp. 6-7) it must be so. Members of the

Senate disagree and stated as much in a letter directed to the US Attorney General (see Exhibit 1) where they highlight the many abuses of the BOP. The Senators aren't the only ones who have filed complaints, the Courts also noted the corrupt practices and customs of the BOP's medical staff. In <u>US v. Frederick Mervin Bardell</u>, 11-cr-401, (MD FL 10-4-2022) the court said as follows: "Judges carry the heavy burden of depriving individuals of their liberty. But the Bureau...shoulders the constitutional burden of protecting the remaining rights of the incarcerated while in custody...the Court admonishes the Bureau and (its) Warden...for their blatant violation of a Court Order and sheer disregard for human dignity. The (Bureau) as an institution and (its) Warden... as an individual should be deeply ashamed of the circumstances surrounding the last stages of Mr. Bardell's incarceration and indeed his life. No individual who is incarcerated by the order of the Court should be stripped of his right to simple human dignity as a consequence. The purposes of incarceration, which include rehabilitation, deterrence, and punishment, do not include depriving a human being of a fundamental right to a life with some semblence of dignity. The treatment Mr. Bardell received in the last days of his life is inconsistent with the moral values of a civilized society and is unworthy of the Department of Justice of the United States.

The Court went on to say, "The (Bureau is)...not above the law or beyond its reach however insular may be their operation. The Court is hopeful that in some small way, these proceedings will illuminate the...arrogant and wholly mistaken notion that it is beyond reproach and the reach of the Court. It is not...the Court is also troubled by his care and treatment while confined,

especially during the latter stages of his incarceration. The Court has serious

reservations about the adequacy of his treatment and diagnosis. In light of

these concerns, the Court recommends that the Attorney General (or the

Inspector General for the Department of Justice) undertake an investigation

into the circumstances of Mr. Bardell's confinement and treatment, the failure...

to respond to his medical needs, and the BOP's misrepresentations in connection

with the compassionate release briefing regarding the seriousness of his con-

dition."

With respect to the Defendant's health issues, as well as that of his mother,

they were completely ignored by the government. The Defendant, while young

was born and lived hours from the greatest radiation disaster in the world,

Chernobyl. In fact, doctors suspect that the radiation exposure to defendant's

mother is the reason she has developed colorectal cancer at such a young age.

The defendant was also exposed to higher levels of radiation, even as a child,

he began to develop skin growths called melanocytic nevi. These skin growths

are at elevated risk of transformation into melanoma cancer. He had these pre-

cancerous growth photographed annually and removed since he was a child. The

BOP mearly makes a notation of these precancerous growths that at anytime can

become melanoma. This is of no concern to the BOP medical staff which will

not refer him to a dermatologist to save money (Exhibit Skin Cancer).

Defendant also has a history of tuberculosis which is not active at the present

time. While the BOP has treated him for prophylactic treatment with anti-

biotics he remains susceptible if he were to become sick with reduced immunity.

PA Krepps documents on his 11-23-22 note defendant's tuberculosis history

and his mother's colon cancer on 9-19-22 note. He also documents on 8-1-22

the fact that defendant was "unable to get a CxR (Chest x-ray) due to insti-
tutional lockdown." FCI Loretto has been in COVID lockdown from 3/2020 to
11/2022 minus a few months. Lockdowns pose a serious risk to inmates health
as the availability of diagnostic and therapeutic modalities from the local
community become limited.

Defendant, according to the BOP's medical note from 8-23-22 document that
he has a peanut allergy, and he develops Anaphylaxis. Anaphylaxis is a severe
allergy where the trachea becomes completely blocked and no air enters the
lungs. Within 4-5 minutes death ensues.Yet the BOP will not allow defendant
to carry an epinepherine pen. COVID lockdowns and lack of access to epipens
pose a serious chance of death to the defendant.

The government does not address and completely ignores defendant's mother's
health. She has cancer and in a war torn country where now medicines, chemo-
therapeutics and availability of specialists due to war are limited at best.
Defendant deserves to be at his mother's side, help his family and his country
at this point in his life. The BOP acknowledges in defendant's medical records
(10-23-22 by NRP Mock) that "home confinement provides the opportunity for
the inmate to practice optimal infection prevention control measures, which
may mitigate risks based on rates of transmission in the local area, and is
likely not to increase the inmate's risk of contracting COVID-19."

The vaccine was given to the defendant on 7-19-22 and  it is already obsolete
against the new variants of COVID-19. Data from the CDC showed that vaccinated
and boosted people made up most of the COVID-19 deaths in August 2022. Of

5

the total of 6,512 deaths, 58.6% of them were attributed to vaccinated/boosted and the trend seems to be growing. "We can no longer say this is a pandemic of the unvaccinated," Cynthia Cox, the vice president of the Kaiser Foundation told the Washington Post in an article November 23, 2022 (Federal Legal News 12-12-22, www.cdc.gov, www.epochtimes.com). —

One of the by-products of the BOP's continuing to botch the COVID response, is the fact that the federal prison system's inner workings and the pre-Cambrian bureaucratic inefficiencies have been fully exposed to members of not only Congress, but also the general public. Seeking prison reform is now a bipartisan process, and even the "anti-crime hawks" will no longer defend the broken system. With respect to the Defendant's health issues the AUSA stated in a footnote:

> "The undersigned has obtained Ivanov-Tolpintsev's medical records directly from the BOP (attached hereto as Attachment A) and cannot identify any condition that could be characterized as "extraordinary and compelling reasons" for a sentence reduction under §3582(c)(1)(A)."

Obviously he has no experience in medicine and is attempting to prejudice the Court with false statements. The Center for Disease Control classifies Tuberculosis and skin cancer as high risk for severe illness or death. The government goes on to say:

> "Potential COVID-19 exposure--which poses a general threat to every person in the world--does not fall into any of the categories outlined above and cannot alone provide a basis for a sentence reduction,"

and they quote a case, US v. Raia, 2020 WL 1647922 at *2 (3rd Cir., 2020) from early 2020 when health services, and the courts were all laboring under mistaken beliefs with respect to the efficacy of the vaccine and the COVID-19 virus itself.

The government also takes the position that "prisoners who have access to a vaccine cannot use the risk of COVID-19 to obtain compassionate release." (See Response, p.6) That is tantamount to saying that you are going to punish a man, or deprive him of his rights, simply because he defends himself. More importantly, this ignores the harsh reality that, according to recent data from the Centers for Disease Control and Prevention (CDC) showed that vaccinated and boosted people made up a majority of the COVID-19 deaths in August. (Source: www.cdc.gov).

When considering the 18 USC 3553(a) factors, the defendant would like the Court to consider that he is low risk for recidivism according to the BOP, the people in the best position to evaluate him. What's more the defendant has no criminal record and less than 13 months to serve. As this Court is well aware, the BOP has not yet given the Defendant the eleven months of jail time (see Exhibit 3) and they continue to deny him his First Step Act (FSA) earned time credits (ETCs). He received his FSA Time Credit Assessment sheet (see Exhibit 4) on 10/09/22 disallowing 124 days. It appears that the large majority of those days was due to incomplete surveys. At no time was he told this was a requirement and there is nothing in 18 USC §§ 3632, 3624, 3635, PS 5220.01 or the Federal Register that says he is disallowed days. The BOP unilaterally uses administrative policy to circumvent the law, a tactic the Supreme Court prohibited in West Virginia v. Environmental Protection Agency, 142 S. Ct. 2587, 213 L. Ed. 2d 896 (2022).

Since the Time Credit Assessment sheet was issued the Defendant has accumu-lated another 75 days of FSA time. If the Court adds his eleven months of

jail time credit to his almost 200 days of FSA ETCs they'll see he's really asking for very little in the way of a sentence reduction, less than 10 months, but those 10 months would mean a lot to his mother. Consider also he has a job waiting for him (see Exhibit 5 ) and the support of the Synagogue (see Exhibit 6 ). Finally, he would like the Court to consider that he has a detainer from ICE and that he would willingly allow them to deport him, making the chances of recidivism as close to zero as possible. Numerous courts have looked favorably on granting compassionate release to defendant's with detainers from ICE.

Courts all over the country have granted compassionate release motions where the defendant had an immigration detainer and was to be deported. United States v. Xiang, 2022 US Dist. LEXIS 120231, at *20 n.6 (SDNY July 7, 2022)("Lin has consented to deportation, and Chen is willing to consent to deportation"); United States v. Rivera, 2022 US Dist. LEXIS 99745, at *6 (SDNY June 3, 2022) (The defendant's sentence was reduced to time served and he was transferred into ICE custody for deportation to the Dominican Republic); United States v. Sosa, 2022 US Dist. LEXIS 12348, at *12 (SDNY Jan. 24, 2022)(Defendant's time reduced to time served and released to ICE detainer); United States v. Rodriguez, 2022 US Dist. LEXIS 8717, at *17 (SDNY Jan. 18, 2022)("The defen- dant will certainly experience his deportation as a form of punishment itself"); United States v. Brunetti, 2022 US Dist. LEXIS 4604, at *19 (SDNY Jan. 10, 2022) (Court reduced life sentence to time served and released defendant to ICE custody for deportation to Colombia); United States v. Rose, 2022 US Dist. LEXIS 706 (SDNY Jan. 3, 2022)(The Court reduced defendant's sentence to time served and ordered "he will [be] immediately deported to Jamaica."); United

States v. Olivares, 2021 US Dist. LEXIS 215536, at *31(D.S.D. Nov. 8, 2021)(The
defendant will be deported upon release, "which is itself a punishment.")
United States v. Nehmad, 2020 US Dist. LEXIS 213883, at *9 (SDNY Nov. 16, 2020)
(Sentence reduced to time served and released to ICE detainer); United States
v. Acevedo, 2020 US Dist. LEXIS 104558, at *8 (SDNY June 15, 2020)(The Court
found that the defendant was "not eligible for home confinement because he
is subject to a[n ICE] detainer" but would have otherwise been a candidate
and granting compassionate release due to pandemic and ordering immediate
release to ICE custody for deportation); United States v. Bayuo, 2020 US Dist.
LEXIS 108696, at *6 (SDNY 2020)(Undocumented defendant convicted of multiple
aggravated felonies released to ICE for deportation). Add to this the fact
the AUSA told the Court that he was sure the Defendant would not commit another
crime.

The magistrate's recommended decision rejected the BOP's position, holding
that it is fundamental that a statute's words generally should be interpreted
as taking their ordinary, contemporary, common meaning at the time Congress
enacted the statute. Agencies exercise discretion only in the interstices
created by statutory silence or ambiguity; they must always give effect to
the unambiguously expressed intent of Congress."

"Here," the Magistrate Judge ruled, "there are no such interstices, because
the relevant portions of the FSA are not ambiguous or incomplete and Congress's
intent is clearly expressed through the mandatory statutory language. The
FSA's language shows that Congress consciously chose to do three things. One,
by its use of "shall be applied" and "shall transfer" language in Section
3624(d)(4)(C), Congress made the application of earned ETCs to effect early

9

release mandatory for prisoners "eligible" under Section 3624(g). Two, by Section 3624(g), Congress spelled out the prerequisites for a prisoner to be "eligible," which have been described earlier and do not contemplate any additional criteria or precondition to release akin to the Pending Charges Exclusion. Third, by Section 3624(d)(4)(C), Congress explicitly determined which prisoners are "ineligible" to have the FSA's ETC and early release provisions applied to them, and none of these expressly delineated categories include prisoners who have pending charges or detainers."

After the recommended decision, the BOP decided that inmate Jones (Jones v. Engleman, Case No. 2:22-cv-05292, 2022 US Dist. LEXIS 185635 [and 185029] (C.D. Cal. Sep. 7 [and Oct. 7], 2022))[inserted respectively] didn't have a detainer after all, so that part of the recommended decision was not adopted.

In a New Jersey case (Moody v. Gubiotti, Case No. 21-12004, 2022 US Dist. LEXIS 181399 (D.N.J., Oct. 3, 2022)), an inmate with a pending Pennsylvania parole detainer was denied his ETCs because, under the BOP rules, he was ineligible for halfway house or home confinement due to a detainer. The District Court ruled that the First Step Act's list of prisoners ineligible for ETCs left no room for the BOP to add other categories. The Court held:

If the warden determines that Petitioner's earned TCs should be applied to early supervised release, rather than prerelease custody to a residential reentry center or home confinement, there is no statutory provision or BOP regulation that precludes application of TCs toward early release of prisoners who have state detainers lodged against them. As Petitioner suggested, the

10

provisions regarding detainers in BOP Program Statement 7310.04 apply only to prerelease custody to residential reentry centers and home confinement. As Respondent points out, however, supervised release is different because it does not involve BOP custody."

Given everything that has been stated and proven the Defendant believes he has numerous extraordinary and compelling reasons and they justify his request for compassionate release. He prays that the Honorable Court will GRANT his request for a compassionate release, sentence reduction, reordering of sentence, or any other remedy the Court deems proper.

December 20, 2022                                  Submitted by

                                                  x _____
                                                  Glib Oleksandr Ivanov-
                                                  Tolpintsev

Exhibit 1

November 16. 2022
The Honorable Merrick Garland
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Dear Attorney General Garland:

We write regarding continued failures by the Federal Bureau of Prisons (BOP) to adequately implement the Earned Time Credit (ETC) provisions of the bipartisan First Step Act
of 2018 (FSA). The FSA enacted critical reforms to promote public safety and make our criminal
justice system fairer. A fair system for awarding time credits to those who participate in
recidivism-reduction programming is necessary to meet the FSA's goal of reducing recidivism
and making our communities safer. Unfortunately, almost four years after the FSA was signed into law, implementation of its ETC provisions continues to fall short. As an initial matter, the ETC implementation process has been characterized by excessive delays. It took the Department until January 2022, three years after the enactment of the FSA, to issue a final rule on ETC.' We appreciate that the final rule, reflecting Congress's intent when we enacted the FSA, is a significant step toward achieving the First Step Act's goal of helping federal prisoners to successfully reintegrate into communities.

However, during that period of delay in the rulemaking process, individuals like Cecilia
Cardenas, who recently testified before the Judiciary Committee, were unable to receive the
benefit they earned for participating in recidivism reduction programs and productive activities. By the time Ms. Cardenas received her credits in January 2022, she had served 11 months longer than she should have. After DOJ announced the final rule, significant numbers of adults in custody again waited months to receive the benefit they were owed as BOP developed a system for automation of ETC calculations.' Despite BOP Director Collette Peters' testimony that BOP's automated system for calculating ETCs went live at the end of August, many federal prisoners did not see updates to their release dates until last month.+
We bring this to your attention to emphasize the need to ensure the swift and consistent
application of ETC to federal prisoner accounts without further delay. Although BOP has
struggled to develop and implement consistent and fair policies to this effect, enough time has
passed that further delay cannot be excused.
There are several additional concerns regarding ETs that require your attention. First, according to recent reports, BOP's new automated system for calculating ETCs initially rescinded previously-awarded supervised release time for certain people in custody. This appears, at least in part, to be a result of BOP retroactively enforcing a policy that federal prisoners were ineligible to earn ETC between January 2020 and January 2022 if they failed to complete "any portion" of the FSA needs assessment, and it appears to disregard the completion
of anti-recidivism programming.'
On October 14, BOP issued corrective guidance which indicates that individuals already in community placements or within two months of a community placement who had previously
received ETC would not see a change in release date based on the automated calculation.° This
October guidance appears to acknowledge the lack of fairness in rescinding ETCs that have been earned, but it is unclear why the arbitrary cutoff of two months was selected. Critically, BOP did not issue a formal program statement on the FSA needs assessment until June 25, 2021, which means that federal prisoners could not have been aware of the requirement of completing the needs assessment from January of 2020 through June of 2021.7 BOP itself reports that nearly half of staff interviewed for a March report indicated no familiarity with, or declined comment on, the needs assessment process and FSA incentives policies. Several of the FSA needs assessment measures rely on self-report surveys, and BOP reports that completion rates for these surveys were low as compared to other assessments.? The primary
purpose of the provision of ETC is to encourage federal prisoners to improve themselves through anti-recidivism and work programs. If DOJ takes away previously earned ETCs based
on incomplete needs assessment surveys where impacted individuals could not have known that the completion of these surveys would become a retroactive requirement that would be used against them, the incentive effects of the FSA will be lost.

Exhibit 1(a)

We strongly encourage you to reconsider this policy, and to put in place policies that do not affect federal prisoners' incentive to participate in valuable programming.

Second, BOP has circulated guidance to its staff that "[eligible inmates will continue to earn [ETCs] toward early release until they have accumulated 365 days or are 18 months from their release date, whichever happens first. At this point, the release date becomes fixed and all additional [ETCs] are applied toward [an earlier transfer to a Residential Reentry Center or home confinement] [emphasis added]." 10 This "18-month rule" is not supported by the FSA, nor does it further the FSA's goal of incentivizing recidivism reduction programming for returning persons. Moreover, under this guidance, any federal prisoner with a sentence of 18 months or less would be unable to earn an earlier release date. BOP should therefore not implement an arbitrary cutoff on earning ETC toward release. Instead, BOP should instead create a system of awarding credits that allows all eligible individuals to receive the full benefit of successfully participating in recidivism reduction programming and productive activities in order to ensure that these programs retain appropriate incentives, as intended by the FSA.

Third, the improvement of the PATTERN risk assessment tool should continue to remain a priority for BOP. As we previously stated following DOJ's release of the April 2022 report on the FSA, "[w]e are pleased to see DOJ heed our calls and make changes to the risk assessment tool, which should help address racial disparities and inaccuracies in previous versions." However, until PATTERN is able to address various unjustified disparities that have arisen, BOP should make full use of its other tools to ensure that federal prisoners are able to have a chance to benefit from the FSA and reintegrate into our communities. The National Sentencing Resource Counsel and the Federal Public and Community Defenders recently raised a concern that BOP is reportedly not using the "warden exception" to permit eligible individuals who are ineligible under PATTERN to transfer to prerelease custody 12 The FSA provides that a federal prisoner may be transferred to prerelease custody after a warden's determination that "the prisoner would not be a danger to society if transferred to prerelease custody or supervised release; the prisoner has made a good faith effort to lower their recidivism risk through participation in recidivism reduction programs or productive activities; and the prisoner is unlikely to recidivate."13 This exception is an important tool to mitigate the flaws and racial disparities that may occur in PATTERN, and BOP must use it appropriately.

Finally, advocates report that BOP currently provides no mechanism to allow people on prerelease custody to earn ETC. The FSA does not prohibit earning credits while in prerelease custody, and continued participation in recidivism reduction programming and productive activities during prerelease custody may further contribute to an individual's success upon release. In its final rule on ETC, BOP stated, "the Bureau agrees that inmates in prerelease custody--whether in residential reentry center (RRC) or home confinement--are eligible to earn FSA time credit under 18 U.S.C. 3632 which they could presumably apply under 18 toward transfer of supervised release. BOP stated that the practical effect of allowing eligible incarcerated people to ear ETC while in prerelease custody would be limited; however, because eligible incarcerated people who satisfy the criteria in 3624(g) would be transferred to supervised release to the extent possible, a fact belied by BOP's "18- month rule." BOP should issue guidance to ensure that eligible individuals who wish to participate in recidivism reduction programming while on prerelease custody are able to obtain appropriate credit.

To better understand the scope of DO's efforts to implement ETCs, we also ask that DOJ provide the following information no later than December 7, 2022: How many people in BOP were awarded ETC before the auto calculation system went live? Of that number, how many people lost ETCs after the auto calculation system went live?
2. How will BOP address ETC for individuals who have lost credits or been denied credits for failure to complete needs assessment surveys?
3. In light of the October 14 memo, how is BOP ensuring that people within the two- month window have had their original award of credits restored? Is there any plan to expedite review of challenges to ETC calculations that implicate the October 14 memo?
4. Who in BOP is responsible for determining if a person is or is not eligible to earn time credits under 18 U.S.C. Section 3632 (d)(4) (D)? Are staff who are responsible for making eligibility determinations given special training on that task?
5. Please verify whether BOP is making adequate use of the warden exception.
In the past two years, the Justice Department has made important strides that demonstrate its commitment to successful implementation of the FSA. For the FSA to realize its full potential, the implementation of ETC requires dramatic improvement without further delay. Now is the time to work together to ensure that the goals of the FSA are fully met. We thank you for your prompt attention to this matter.

Sincerely,

Richard J. Durbin

Charles E. Grassley

In a fresh case, US v. Ruvalcaba, 26 F.4th 14 (1st Cir., 2022), the First Circuit Court of Appeals held last month that district courts adjudicating a prisoner-initiated motion for compassionate release under 18 USC 3582(c)(1)(A)(i) are not bound by the Sentencing Commission's current policy statement in USSG Manual §1B1.13 because that provision is applicable only to compassionate release motions initiated by the federal BOP.

The Court's ruling that the Sentencing Commission's policy statement in USSG §1B1.13 does not apply ro prisoner-initiated compassionate release motions and thus does not constrain District Courts when adjudicating such motions aligns with the vast majority of other Courts of Appeals that have addressed this issue. See United States v. Andrews, 12 F.4th 255 (3d Cir. 2021); United States v. Long, 997 F.3d 342 (D.C. Cir. 2021); United States v. Aruda, 993 F.3d 797 (9th Cir. 2021); United States v. Shkambi, 993 F.3d 388 (5th Cir. 2021); United States v. McGee, 992 F.3d 1035 (10th Cir. 2021); United States v. Mc Coy, 981 F.3d 271 (4th Cir. 2020); United States v. Jones, 980 F.3d 1098 (6th Cir. 2020); United States v. Gunn, 980 F.3d 1178 (7th Cir. 2020); United States v. Brooker, 976 F.3d 228 (2d Cir. 2020).

## DERMATOLOGY: SKIN CANCERS

### BASAL CELL CARCINOMA (BCC)
- **Clinical Presentation of BCC**
  - Nodular BCC: nodule with a pearly, translucent surface and telangiectasias
    - Typical location is on the head and neck
  - Sclerosing BCC: whitish, hard plaque with indistinct margins
  - Superficial BCC: reddish plaque with overlying scale usually on the back
- **Diagnosis** best made by a punch biopsy
- **Treatment options**
  - Surgical excision with 5-mm margins
  - Consider Moh's micrographic surgery for high-risk BCCs: on the central face, nose, lips, ears, genitals; >10 mm in size; for perineural or perivascular involvement; or for fibrosing or recurrent BCCs
  - Imiquimod 5% cream qhs 5×/week × 8–16 wks for superficial BCCs ≤2 cm
  - Curettage and electrodessication for medium-risk, nonfibrosing BCCs
  - Nonsurgical management of nodular or superficial BCCs: methyl-aminolevulinate photodynamic or intralesional interferon-alpha therapy
  - 5% fluorouracil cream/solution bid is an alternative for superficial BCCs

### CUTANEOUS SQUAMOUS CELL CARCINOMA (SCC)
- **Clinical Presentation**
  - Typically nontender papule or plaque with a dark, hyperkeratotic, adherent scale and/or overlying ulceration
  - May arise from a pre-existing actinic keratosis or cutaneous horn
  - Commonly on scalp, face, lips, forearms, or dorsum of hands
- **Diagnosis** best made by a punch biopsy
- **High-Risk Features for Metastasis**
  - Depth >4 mm, poorly differentiated SCC, perineural or intravascular invasion, size >2 cm, recurrent SCC or location on ear, lips, or genitals
- **Treatment Options**
  - Surgical excision with 4–5 mm margins is the treatment of choice
  - Consider Moh's micrographic surgery for SCC on the central face, nose, lips, ears, genitals, fingers, and for recurrent squamous cell carcinomas
  - Imiquimod 5% cream bid or 5-fluorouracil 5% cream bid × 6–16 weeks can be used for Bowen's disease (squamous cell carcinoma *in situ*)

  - Methyl-aminolevulinate photodynamic or intralesional interferon-alpha therapy for well-delineated, primary SCCs <2 cm in nonsurgical candidates

### MELANOMA
- **Clinical Presentation**
  - Superficial spreading melanoma: brown or black macules or patches usually with irregular borders and color variation
  - Nodular melanoma: nodules that may be black, brown, red, or hypopigmented (amelanotic melanomas)
  - Acral lentiginous: hyperpigmented patch on the palms, soles, or subungual
  - Lentigo maligna: may progress to melanoma *in situ*; usually on head/neck
- **Diagnosis**: excisional biopsy of lesion; shave biopsies contraindicated
- **Staging**: sentinel lymph node biopsy for any of the following criteria: lesion >1 mm thick, Clark level ≥ IV, positive biopsy margins or if lesion is ulcerated
  - Chest X-ray, lactate dehydrogenase, albumin, and hemoglobin
  - If lymph node biopsy positive, obtain a chest/abdomen CT scan, head MRI, and PET scan
- **Treatment Options**
  - Definitive treatment is surgical excision with the following surgical margins based on the microscopic depth of the melanoma found by biopsy
  - Sentinel lymph node biopsy indicated for staging for melanoma >1 mm in tumor thickness

| Melanoma depth | In situ melanoma | ≤1 mm depth | 1.01–2 mm depth | >2 mm depth |
|---|---|---|---|---|
| Surgical Margins | 0.5–1 cm | 1.0 cm | 1–2 cm | 2 cm |

References: *N Engl J Med*, 2001;344:975; *N Engl J Med*, 2004;351:998; *Am Fam Physician*, 2005;72:41; *J Am Acad Derm*, 2007;56:91; *J Am Acad Derm*, 2011;65:1032–47; *Br J Derm*, 2008;159:35–48, and NCCN 2007 Clinical Practice Guidelines for Skin Cancers available at www.nccn.org

Source:
Tarascon Primary
Care Pocketbook
4th Edition,
Joseph S. Esherick, M.D.



UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                      CASE NO. 8:20-cr-309-SDM-AEP

GLIB OLEKSANDR IVANOV-
TOLPINSTEV
_____/

## ORDER

The defendant's motion (Doc. 61) for a recommendation to the BOP is

**GRANTED** to the extent stated in the attached letter addressed to the warden.

ORDERED in Tampa, Florida, on October 11, 2022.

_____
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE

# United States District Court

MIDDLE DISTRICT OF FLORIDA
UNITED STATES COURTHOUSE
801 NORTH FLORIDA AVENUE, SUITE 1530
TAMPA, FLORIDA  33602-3800

STEVEN D. MERRYDAY                                                    (813) 301-5001
UNITED STATES DISTRICT JUDGE

October 11, 2022

Warden
FCI Loretto
772 Saint Joseph St.
Loretto, PA 15940

Dear Warden:

I am in receipt of the attached September 18, 2022 letter from Mr. Glib
Oleksandr Ivanov-Tolpinstev, Reg. #63147-509. I endorse Mr. Ivanov-
Tolpinestev's receiving credit for time served after his October 3, 2020 arrest on the
offense of conviction by Polish authorities in anticipation of extradition to the
United States.

Exhibit 4

## FSA Time Credit Assessment
Register Number:63147-509, Last Name:IVANOV-TOLPINTSEV

**U.S. DEPARTMENT OF JUSTICE**                    **FEDERAL BUREAU OF PRISONS**

| | |
|---|---|
| Register Number....: 63147-509 | Responsible Facility: LOR |
| Inmate Name | Assessment Date.....: 10-09-2022 |
|   Last.............: IVANOV-TOLPINTSEV | Period Start/Stop...: 05-12-2022 to 10-09-2022 |
|   First............: GLIB | Accrued Pgm Days....: 26 |
|   Middle...........: OLEKSAND | Disallowed Pgm Days.: 124 |
|   Suffix...........: | FTC Towards RRC/HC..: 0 |
| Gender.............: MALE | FTC Towards Release.: 0 |
| Start Incarceration: 05-12-2022 | Can Apply FTC.......: Yes |

| Start | Stop | Pgm Status | Pgm Days |
|---|---|---|---|
| 05-12-2022 | 09-13-2022 | disallow | 124 |

  Not in qualifying admit status

| Facility | Category | Assignment | Start | | Stop | |
|---|---|---|---|---|---|---|
| DSC | ARS | A-ADMIN | 05-18-2022 | 0933 | 05-18-2022 | 0950 |
| DSC | ARS | ADMIN RMV | 05-18-2022 | 0950 | 05-24-2022 | 1247 |
| DSC | ARS | A-ADMIN | 05-24-2022 | 1247 | 05-24-2022 | 1559 |
| DSC | ARS | ADMIN REL | 05-24-2022 | 1559 | 05-24-2022 | 1559 |
| 9-L | ARS | A-ADMIT | 05-24-2022 | 1659 | 07-18-2022 | 1557 |
| 9-L | ARS | RELEASE | 07-18-2022 | 1557 | 07-18-2022 | 1557 |
| ALP | ARS | A-BOP HLD | 07-18-2022 | 1557 | 08-23-2022 | 0519 |

  Incomplete needs assessment

  Missing Need Area(s)

  Anger/Hostility

  Antisocial Peers

  Cognitions

| Facility | Category | Assignment | Start | | Stop | |
|---|---|---|---|---|---|---|
| LOR | FSA | N-ANGER R | 07-31-2022 | 0000 | 09-13-2022 | 1310 |
| LOR | FSA | N-ANTISO R | 07-31-2022 | 0000 | 09-13-2022 | 1310 |
| LOR | FSA | N-COGNTV R | 07-31-2022 | 0000 | 09-13-2022 | 1310 |
| LOR | FSA | N-FM/PAR R | 07-31-2022 | 0000 | 09-13-2022 | 1310 |
| LOR | FSA | N-ANGER R | 09-13-2022 | 1310 | 09-24-2022 | 0934 |
| LOR | FSA | N-FM/PAR R | 09-13-2022 | 1310 | 09-24-2022 | 0934 |
| LOR | FSA | N-ANTISO R | 09-13-2022 | 1310 | 09-24-2022 | 0934 |
| LOR | FSA | N-COGNTV R | 09-13-2022 | 1310 | 09-24-2022 | 0934 |



RECEIVED
NOV 04 2022
By_____

---------------------------------------------------------------

| Start | Stop | Pgm Status | Pgm Days |
|---|---|---|---|
| 09-13-2022 | 10-09-2022 | accrue | 26 |

  Accrued Pgm Days...: 26

  Carry Over Pgm Days: 0

  Time Credit Factor.: 10

  Time Credits.......: 0

16 November 2022

Honorable Steven D. Merryday

Dear Judge Merryday,

My name is Oleksandr Ivanov-Tolpintsev. I am the head of "Partner-ATG" firm, which specializes in car filters and spare parts. Glib has been working in our firm since he was 18 years old.

I am writing concerning my son, Glib Ivanov-Tolpintsev. his criminal docket No. 8:20-cr-309-SDM-AEP.

As his chief, I can describe him as a person who can solve the tasks assigned to him quickly and effectively, execute his work faithfully, and is competent in his field, has a high potential for career growth. Glib is also a reasonable, emotionally stable, disciplined person, polite with clients, courteous with colleagues, demanding of himself, possessing a desire for self-education, introspection.

He agreed to replace colleagues as a sales manager multiple times when needed.

His workplace is kept for him with an opportunity for further career growth, and as his father and chief I will do everything to help him after his return from the jail.

Sincerely,
Oleksandr Ivanov-Tolpintsev
Chernivtsi, Ukraine
58000



16 листопада 2022 року

Шановному судді Стівену Д. Меррідею,

Мене звати Олександр Іванов-Толпінцев.

Я пишу Вам стосовно мого сина, Гліба Іванова-Толпінцева, номер його кримінальної справи 8:20-cr-309-SDM-AEP.

Я очолюю компанію «Партнер-АТГ», яка спеціалізується на підборі та продажі фільтрів та запчастин для автомобілів. Гліб працював у нашій фірмі з 18 років.

Як керівник, я можу охарактеризувати його як людину, яка вміє швидко та ефективно вирішувати поставлені перед ним завдання, сумлінно виконувати свою роботу та є компетентним у своїй справі, має високий потенціал кар'єрного росту.

Гліб також людина розсудлива, емоційно стійка, дисциплінована, ввічлива з клієнтами та колегами, вимоглива до себе, має прагнення до саморозвитку, самоаналізу.

За необхідності, він неодноразово погоджувався замінювати колег в якості менеджера з продажів.

За ним зберігається робоче місце з можливістю подальшого кар'єрного росту, і як його батько і керівник я зроблю все, щоб допомогти йому, коли він повернеться з тюрми.

З повагою,
Олександр Іванов-Толпінцев
Чернівці, Україна,
58000





ЧЕРНІВЕЦЬКА МІСЬКА БЛАГОДІЙНА ЄВРЕЙСЬКА ГРОМАДА

## " МІР`ЯМ "

Україна, 58003
м.Чернівці, вул. Л.Кобилиці, 53
khochi51@gmail.com
т. (03722)-516-111
(+38)067-372-16-68

Exhibit 6

Вих. № *01/223*
" *18* " *11* 20*22*р.

To the Honorable Judge
Steven D. Merryday,

My name is Ilya Khoch, I am the head of the "Hesed-Shushana" Charitable Foundation and leader of the Chernivtsi Jewish community "Miriam".

I am writing you regarding the Glib Ivanov-Tolpintsev, criminal docket No. 8:20-cr-309-SDM-AEP.

I have known Glib and his family since he was a child. Glib is an active member of our Jewish community, throughout his life he shows reverence and adherence to our religious tradition. I can describe him as a responsible, kind, and empathic person.

I heard that he is imprisoned now. I am sure that he is trying to redeem himself.

I can assure you that our community will do everything to follow his behavior after his return and will help him give a new start in life and will guide and support Glib.

Yours respectfully,
Ilya Khoch
Chernivtsi, Ukraine
58000



ЧЕРНІВЕЦЬКА МІСЬКА БЛАГОДІЙНА ЄВРЕЙСЬКА ГРОМАДА

## "МІР`ЯМ"

Україна, 58003
м.Чернівці, вул. Л.Кобилиці, 53
khochi51@gmail.com
т. (03722)-516-111
(+38) 067-372-16-68

Exhibit 6(a)

Вих. № 111/223
" 16 " 11 2022 р.

Шановному судді
Стівену Д. Меррідею,

Мене звати Ілля Хочь, я очолюю благодійний фонд "Хесед-Шушана" та є керівником Чернівецької єврейської громади "Міріам".

Звертаюся до Вас щодо Гліба Іванова-Толпінцева, номер кримінальної справи 8:20-cr-309-SDM-AEP.

Я знаю Гліба та його родину ще з його дитинства. Гліб є активним членом нашої єврейської громади, протягом усього свого життя він демонструє шанування та дотримання нашої релігійної традиції. Я можу описати його як відповідальну, добру та співчутливу людину.

Я чув, що він зараз знаходиться у тюрмі. Я впевнений, що він намагається спокути свою провину.

Можу вас запевнити, що наша спільнота зробить все, щоб прослідкувати за його поведінкою після його повернення, допомагатиме йому почати життя з чистого листа, направлятиме та підтримуватиме Гліба.

З повагою,
Ілля Хочь
Чернівці, Україна
58000



Clerk of the Court                                    December 20 , 2022
United States District Court
801 N. Florida Ave., Suite 1530
Tampa, FL 33602

Case No.: 8:20-cr-309

Dear Sir/Madam:

Enclosed you will find my response for reduction of sentence under 18 USC

§3582(c)(1)(A)(i). Please be aware that I am presenting this pro se and in

forma pauperis.

I appreciate your consideration.


                                              Sincerely,

                                          x _____
                                              Glib Oleksandr Ivanov-
                                              Tolpintsev